2023 IL App (1st) 190027

SECOND DIVISION
March 28, 2023

No. 1-19-0027

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 MC1 210837 |
| | ) | |
| CORDARO DEANDRE SADDER-BEY, | ) | Honorable |
| | ) | Adrienne Davis, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Presiding Justice Fitzgerald Smith and Justice Howse concurred in the judgment and opinion.

**OPINION**

¶ 1 In September 2018, the police pulled over Cordaro Deandre Sadder-Bey, the defendant here, for a minor traffic violation. When an officer asked him for his license and proof that his car was insured, Sadder-Bay was less than cooperative. He refused to give the officers his license, argued that he was not "under their jurisdiction," and was generally obstinate. After about 45 seconds of relatively polite but forceful disagreement, Chicago police officer DeYoung ordered defendant to get out of his car.

¶ 2 Defendant refused multiple times, so DeYoung pulled out his Taser and pointed it through the cracked driver's side window, again demanding that defendant get out of the car. After about a minute of more arguing, DeYoung reached in through the cracked car window to

try and open the door from the inside. The window went up slightly, then immediately down. DeYoung opened the door, and another police officer—there were at least five on scene—came over and took hold of defendant's arm. Defendant continued to verbally protest and still refused to get out. Finally, the officer who had him by the arm politely but firmly gave defendant a choice: he could get out of the car, or the officer would pull him out of it. Faced with this, defendant said he would get out of his own accord and did. Officers cuffed him, then searched his car.

¶ 3    The State charged defendant with possession of marijuana, resisting a peace officer, and various traffic offenses. Prosecutors dropped the drug charge before trial, and the circuit court convicted defendant of resisting arrest and driving without insurance after a bench trial. He appeals, arguing that while he did not obey the officer's orders immediately, his acts during the traffic stop were not enough to convict him of resisting a peace officer. We agree and reverse that conviction.

¶ 4                          BACKGROUND

¶ 5    We elicit the following facts from defendant's bench trial. On September 29, 2018, Officer DeYoung (he never gave his first name) testified that he was on routine patrol driving an unmarked squad car on 79th Street at around 1 p.m. Around that time, he saw a black BMW go over the center line of the road and decided to pull the car over. After the car stopped, DeYoung approached the driver's side of the BMW while his two partners went to the other side of the car. Defendant was driving, and DeYoung requested his driver's license and proof the car was insured. Defendant did not cooperate, however, and DeYoung said he repeated his request numerous times. Still, defendant did not obey, DeYoung said. He then asked defendant multiple times to exit the BMW, but defendant refused and "stated that [DeYoung] did not have

jurisdiction over him and that [defendant] was simply traveling, he did not need to provide any driver's license to [DeYoung]."

¶ 6    DeYoung said he reached into the vehicle to unlock the door, but defendant rolled the window partway up on DeYoung's arm. DeYoung withdrew his arm and, "as a preventative measure and for [his] own safety[,]" drew his Taser because he believed defendant's refusal "could be because there [was] some contraband or a weapon involved." Two other officers then approached the driver's side and opened the door. Another officer continued to ask defendant to exit the vehicle. That officer placed his arm on defendant to guide him out of the BMW, but DeYoung said that defendant "stiffened his arms and once again refused." After being asked several more times to step out of the vehicle, defendant complied.

¶ 7    DeYoung testified that defendant was placed into custody upon exiting the vehicle and that his driver's license was found after a custodial search. Police seized the vehicle, and inside it they found "narcotics" associated with the passenger, along with "paperwork that defendant attempted to give [the police] regarding his status as a sovereign citizen." DeYoung did not find any evidence that the car was insured.

¶ 8    The parties stipulated to the State's admission into evidence of a video clip from a police body camera. DeYoung testified that the footage depicted the stop and was from the body camera of another officer. The footage was played for the court.

¶ 9    That video is included in the record on appeal. But we note the exhibit is a data disc with seven separate video files on it—but the trial judge only saw two videos of the incident. At trial, neither party specified which files the court saw. Although we do not know which videos the trial court saw, because the parties all agree the videos accurately depict the stop, we have reviewed them all.

¶ 10    The videos depict the entirety of the stop, including when DeYoung got out of his car and approached defendant's windows. When police stopped defendant, at least five officers in two separate cars surrounded defendant. Police parked a large, unmarked SUV in front of defendant's sedan, while DeYoung parked his unmarked car behind it. DeYoung approached the driver's side window, while at least two or three other officers approached the passenger's side. All were in standard blue Chicago police duty uniforms. All wore body cameras, and they depict the entirety of the stop from multiple angles.

¶ 11    DeYoung tapped on defendant's car window, which was tinted. DeYoung asked defendant at least twice to roll down the window; defendant did, but only about two inches. Through the cracked window, defendant asked why he had been stopped, and DeYoung told him he had been speeding, going more than 40 miles per hour in a zone where the speed limit was 30. (We note the discrepancy between what DeYoung told defendant at the stop and what DeYoung said at trial.) Meanwhile, on the other side of the car, passenger Amber Baker had rolled her window nearly completely down and two police officers were speaking with her. Both could clearly see defendant on the other side of the car.

¶ 12    Approximately 40 seconds after he stopped defendant, DeYoung asked him if he had a driver's license or insurance twice. What defendant said in response is unintelligible, but DeYoung immediately told defendant he "needed to step out of the vehicle" for "failing to produce a driver's license or identification." Defendant seemingly said something to the effect that he was just "travelling" and did not need to show his license, to which DeYoung told him that was "not a thing" and "we don't deal with that B.S."

¶ 13    DeYoung then again asked defendant to get out of the car or "I'm gonna call a supervisor to the scene and we're gonna pull you out of the car." Defendant continued to argue—albeit it

politely—with DeYoung, and the officer responded by telling defendant numerous times to "step out of the car." Defendant made no effort to begin to get out of the car. DeYoung then took out his Taser and pointed it at defendant through the cracked window. About 45 seconds elapsed from the time DeYoung asked defendant for his license and insurance to when he took out his Taser and pointed it at defendant. On a separate video, from an officer who was speaking with the passenger during the incident, defendant can be seen holding only a folder in his hand with the logo of the State Farm Insurance Company (State Farm).

¶ 14     While pointing his Taser at defendant through the window, DeYoung asked him to get out of the car multiple times. Defendant did not comply but did continue to ask DeYoung why he needed to get out of the car, among other things. DeYoung began to reach through the cracked window, and it went up momentarily, causing DeYoung to pull his hand quickly back. But the window then reversed and went completely down, allowing DeYoung to reach into the car. Defendant's hands were visible, as was the State Farm folder on his lap. Defendant asked DeYoung not to damage his car and said it was his private property, then he opened the folder and said he had "court documents here" to show the officer. DeYoung reached into the car door and opened it. From the time DeYoung took out his Taser to when he opened the car door, approximately 25 seconds elapsed.

¶ 15     Another officer, who was not identified on video or at trial and did not testify, but was wearing a body camera, then approached defendant, who was still sitting in his car. Defendant told the officers that he was "not in your jurisdiction." The officer reached over and unbuckled defendant's seat belt; defendant made no effort to stop him. That officer then took defendant's hand and navigated the seat belt around it. Again, defendant made no effort to stop or fight the officer but continued to ask why he had to get out of the vehicle. The officer told him that if he

has no ID, they can ask him to step out of the car.

¶ 16    The officer then took the State Farm folder from defendant and placed it on the dash; defendant again protested that the officers did not have "jurisdiction" over him and grabbed the folder again. Finally, the officer holding onto defendant's arm told him:

> "I'm only going to ask you one more time, and then I'm going to take you out of the car. So, I'm going to ask you again to come out of the vehicle, and if not, I'm going to remove you from this vehicle. Do you understand what I'm telling you?"

Defendant said he did. The officer told him to step out of the car, and after a brief moment, defendant said, "I will get out." He slowly rose out of the car, assisted by the officer. The officers placed him in handcuffs without any visible problem or struggle.

¶ 17    In total, approximately two minutes passed from the time DeYoung asked defendant for his license and insurance to the time he got out of the car.

¶ 18    In his case, defendant called Amber Baker, who testified that she had been the passenger in the BMW defendant was driving at the time of the stop. An unmarked police car followed the BMW for three or four blocks. Once the BMW was stopped, police approached the passenger's side first. Defendant also played a video clip from the body camera of an unnamed officer, informing the court it was not the same video played by the State. Baker testified that the video accurately depicted the incident.

¶ 19    Defendant, who chose to represent himself, also testified. He said he first saw the squad car at a four-way stop; the squad car yielded to him before turning right, heading eastward, to follow the car he was driving. At or near 79th Street, traffic was heavy with cars and pedestrians. Because he was aware that the squad car was following him, defendant said he observed all traffic laws, yielded for pedestrians, "waited to make sure [he could] do a safe passing around the

motorist through the individual yellow lines[,]" and used his turn signal before passing the reversing vehicle. Once he drove around the vehicle that was being parked, he was "curbed and blocked in by the three unmarked police cars." An officer came to the passenger's side of the BMW and asked questions. When an officer approached the driver's side, defendant said the officer "didn't state a probable cause, he asked for a driver's license and insurance alleging that [defendant] was doing some type of commercial activity." Defendant attempted to show the police "court documentation" declaring his nationality and name change, but "they kept ignoring it."

¶ 20     On cross-examination, defendant admitted that the police asked for his driver's license and proof of insurance. He testified that he did not provide them because he was not "driving" at the time given that "in Black's Law Dictionary driving is doing commerce."

¶ 21     After hearing closing arguments, the trial court found defendant guilty of resisting a peace officer and driving an uninsured motor vehicle. The court said it had "no choice" but to find him guilty because "it was clear in the video that you were resisting, you rolling down [*sic*] the window, the [not] getting out of the car."

¶ 22     On December 4, 2018, the court sentenced defendant to two days' imprisonment for resisting an officer and credited him with the two days he had already served. On March 31, 2022, our supreme court granted defendant's motion for a supervisory order and directed this court to treat his notice of appeal as a properly perfected appeal from the trial court's judgment.

¶ 23                              ANALYSIS

¶ 24     Before us, the only argument defendant makes is that the evidence was insufficient to prove he resisted a peace officer in violation of section 31-1 of the Criminal Code of 2012 (Criminal Code) (720 ILCS 5/31-1(a) (West 2018)). He does not challenge his conviction for

driving without insurance, so that conviction stands.

¶ 25    Due process prohibits the conviction of a person " 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' " *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004) (quoting *In re Winship*, 397 U.S. 358, 364 (1970)). When reviewing the sufficiency of the evidence, we ask whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found defendant committed the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Collins*, 106 Ill. 2d 237, 261 (1985).

¶ 26    To convict a defendant of resisting or obstructing a peace officer, the State must prove that the defendant resisted or obstructed someone he knew was a peace officer, and that this obstruction or resistance actually impeded or hindered the officer from conducting an act that he or she was authorized to perform. 720 ILCS 5/31-1(a) (West 2018); *People v. Baskerville*, 2012 IL 111056, ¶ 23.

¶ 27    The misdemeanor complaint, as amended at trial, alleged that defendant knowingly "resisted the performance of an authorized act within the officer's official capacity and engagement in the execution of his or her official duties in that while known to defendant to be a peace officer refused to exit the motor vehicle after multiple lawful orders."

¶ 28    There is no dispute that defendant knew DeYoung was a police officer and that DeYoung was authorized to order defendant out of the car after he stopped him. *Maryland v. Wilson*, 519 U.S. 408, 415 (1997); *People v. Gonzalez*, 184 Ill. 2d 402, 413-14 (1998) (after lawful stop, officer may legally order driver and passengers out of vehicle). The only question here is whether defendant knowingly "resisted" DeYoung's performance of his duties as section 31-1 of the Criminal Code contemplates the term.

¶ 29    Critically, the State only charged defendant with resisting, *not* obstructing. At trial and now on appeal, the State insists that defendant did not obstruct DeYoung but rather resisted him. So we will limit our review to only acts of "resistance" that could sustain the conviction.

¶ 30    The statute does not define "resist," but our supreme court has read "resisting" or "resistance" to mean "withstanding the force or effect of" or the "exertion of oneself to counteract or defeat." (Internal quotation marks omitted.) *People v. Raby*, 40 Ill. 2d 392, 399 (1968). "Resist" implies some type of physical exertion in relation to the officer's acts—*i.e.* a reaction to the officer's action. *Baskerville*, 2012 IL 111056, ¶ 25.

¶ 31    That said, defendant posits that not all acts of "resistance" are criminal. He argues that, to be guilty of the crime of resisting a peace officer, his actions must have the effect of "materially hindering" the officer. Thus, in defendant's eyes, section 31-1 does not criminalize momentary delays a defendant might cause, even if they technically hamper an officer from performing his duties. The actions must be more than token resistance.

¶ 32    This idea originates in *People v. Comage*, 241 Ill. 2d 139 (2011). There, our supreme court examined what someone must do to obstruct justice in Illinois, a separate but closely related crime. *Id.* at 149; 720 ILCS 5/31-4 (West 2010). Relevant here, the court concluded that a defendant obstructing justice must make "an attempt to interfere with the administration of the courts, the judicial system, or law enforcement agencies." *Comage*, 241 Ill. 2d at 149. However, only acts that *actually* interfere with the administration of justice—*i.e.*, conduct that obstructs the prosecution or defense of any person—are criminal. *Id.* A defendant only actually interferes with the administration of justice if he "materially impedes" a police investigation. *Id.* at 150.

¶ 33    Two years later, in *Baskerville*, 2012 IL 111056, ¶ 28, the court noted that the laws forbidding obstructing a *peace officer* and obstructing *justice* contemplate the same "obstructive

conduct." While *Baskerville* did not explicitly reference the materiality requirement *Comage* discussed, the court implied that the definition of "obstruct" was the same in both statutes, and that the statutes targeted people who tried to interfere with the various players in the justice system. *Id.* ¶ 19.

¶ 34    A few years later, taking cues from *Comage* and *Baskerville*, this court determined that the materiality requirement in obstructing justice also applied to the crime of obstructing a peace officer. *People v. Mehta*, 2020 IL App (3d) 180020, ¶ 23. Thus, to be guilty of obstruction of a peace officer, a defendant must *materially* impede or hinder an officer in the performance of his or her authorized duties. *Id.* ¶ 26; see *Baskerville*, 2012 IL 111056, ¶ 23.

¶ 35    Although it did not mention *Mehta*, the supreme court signaled its agreement a few months later in *People v. Casler*, 2020 IL 125117, ¶ 41. The defendant in *Casler* was charged with obstructing justice, not a peace officer, but the court observed that "[c]onstrued together, *Comage* and *Baskerville* firmly establish that a defendant's acts must be a *material* impediment and must be proved in a prosecution for obstructing justice." (Emphasis added.) *Id.*

¶ 36    From these cases, we conclude that crimes of obstruction, either of a peace officer (section 31-1) or justice (section 31-4), include a requirement that defendant's obstruction be material. While an act might hinder or impede an officer in the technical sense, that hindrance or impediment may be "so minimal as to not be considered a violation of the statute in question." *Mehta*, 2020 IL App (3d) 180020, ¶ 21. Another decision from this court recently came to the same conclusion. See *People v. Gotschall*, 2022 IL App (4th) 210256, ¶ 27.

¶ 37    The rub is that *Mehta* and *Gotschall*, not to mention the supreme court decisions upon which they rely, discussed the crime of "obstructing," not "resisting." Indeed, in the other cases that have reviewed resisting convictions, the concept of "materiality" has never come up. The

State points out that no court has explicitly recognized a materiality requirement to *resisting* a peace officer, and our research reflects the same. But we think previous cases clearly hint there is one for the crime of resisting as well.

¶ 38    For example, in *People v. Stoudt*, 198 Ill. App. 3d 124 (1990), defendant was convicted of resisting because he refused police orders to "remove himself" from a highway. *Id.* at 127. We reversed, observing that an "allegation of failure to *cooperate* with an officer is not necessarily the same as *resisting* or *obstructing* an officer." (Emphases in original.) *Id.* And in *People v. Weathington*, 82 Ill. 2d 183 (1980), the supreme court reversed a resisting conviction when the defendant, while being booked at the county jail, initially refused to answer questions about his identity but eventually cooperated. *Id.* at 185. "[W]here the defendant merely argued with the officer as to when he would answer the booking questions and then, after an indefinite but certainly a brief time, did answer the questions, no offense took place." *Id.* at 187. Underpinning both *Stoudt* and *Weathington* is the idea that token resistance is not criminal.

¶ 39    We agree with *Metha* and *Gotschall* that section 31-1 includes a requirement that the defendant's acts materially interfere with the officer, and we extend it to the crime of resisting a peace officer. Acts that obstruct might be different from those that resist, but the line by which they become criminal is drawn in the same place. While they are two separate prohibitions, the crime of obstructing or resisting a peace officer "addresses related types of interference." *Baskerville*, 2012 IL 111056, ¶ 25.

¶ 40    Thus, to be guilty of resisting a peace officer as section 31-1 contemplates it, the defendant must physically exert himself in a manner that actually interferes with the administration of justice—that is, he must act in a way that *materially* opposes an officer's attempt to perform an authorized act.

¶ 41     Here, then, defendant here must have committed "some physical act which imposes an obstacle which may impede, hinder, interrupt, prevent or delay the performance of the officer's duties, such as going limp, forcefully resisting arrest or physically aiding a third party to avoid arrest." (Internal quotation marks omitted.) *Raby*, 40 Ill. 2d at 399. However, arguing with an officer does not, standing on its own, violate the law. *People v. Flannigan*, 131 Ill. App. 2d 1059, 1062 (1971).

¶ 42     Although he was polite for the entirety of the stop, defendant was certainly quarrelsome. He refused multiple commands to get out of the car and instead continued to argue with DeYoung. This passive act, the State argues, was itself an obstacle for the police and thus resisting. Passive acts, or failing to act when ordered to, can be acts of "resistance," but they often will need to be combined with some other act of opposition or counteraction to reach a level of materiality that is criminal. This could be "going limp" (internal quotation marks omitted) (*Raby*, 40 Ill. 2d at 399) or indicating an intent to counteract an officer's order or force, such as grabbing the steering wheel of a car in defiance when the officer says to get out of it (*People v. Synnott*, 349 Ill. App. 3d 223, 224 (2004)).

¶ 43     But defendant here did not go limp or suggest that he was about to fight back. He refused to immediately do what DeYoung ordered him to. That, on its own, is not criminal. See, *e.g.*, *People v. Kotlinski*, 2011 IL App (2d) 101251, ¶ 47. Section 31-1 requires a person to comply with a peace officer's authorized actions, but it does not call for complete and immediate submission. See *People v. McCoy*, 378 Ill. App. 3d 954, 971 (2008) (McDade, P.J., concurring in part and dissenting in part); see also *Flannigan*, 131 Ill. App. 2d at 1063 (defendant does not need to be "paragon of cooperation" to avoid conviction for resisting).

¶ 44     Beyond this intransigence, the State identifies two actions taken by defendant. The first is

when defendant very briefly rolled up his window after DeYoung tried to reach in to open the car door. And indeed, the video shows that the window did go up slightly when DeYoung reached into the car—but it also shows that it immediately went all the way down. Again, DeYoung was almost immediately able to open the car door. This act of "resistance" was more likely a slip of the finger when defendant tried to lower the window, considering how quickly it rolled down after it went up.

¶ 45    The second purported resistive act was when, as DeYoung testified, defendant "stiffened" his arm when officers took hold of him. We note that DeYoung was not the officer who took defendant's arm; another officer did, after DeYoung opened the door. Although that officer did not testify, his body camera was included in the State's exhibit. From the video, we observe that defendant never pulled his arm away or otherwise attempted to fight back.

¶ 46    To the contrary, the video shows that defendant was cooperative once the officer took hold of him. After DeYoung opened the car door, the unnamed officer went over to defendant at the side of the car. The officer slowly reached over defendant's body, unbuckled his seat belt, and then took defendant's arm and navigated it around the belt until defendant was no longer restrained. Defendant did not move or otherwise resist.

¶ 47    If anything, defendant acted appropriately during this whole sequence. He made no sudden movements that could have posed a threat or given the impression that he was preparing to resist the officer. *Cf. Synnott*, 349 Ill. App. 3d at 224 (defendant grabbed steering wheel when officer told him to step out of car). In fact, when the officer reached across defendant and unlatched his seatbelt, defendant did not react at all, other than to continue verbally protesting his stop.

¶ 48    Finally, the officer took hold of defendant's arm and asked him to get out of the car.

After more debate, the officer gave defendant an ultimatum: get out of the car, or the officers would pull him out. Faced with the unequivocal knowledge that the police were about to exert force on him, defendant submitted, told the officer he would get out, and did so under his own power and without incident. If defendant was going to resist, this was the moment. Instead, he told the officer he would get out of the car and then did so.

¶ 49    Less than two minutes elapsed from when DeYoung first asked defendant to get out of the car to when he did. In total, defendant's actions here were an insubstantial display of antagonism and belligerence, not criminal resisting. *Flannigan*, 131 Ill. App. 2d at 1063. Nor did he actually interfere with the administration of justice, as DeYoung was able to do what he set out to do—determine if defendant had a valid driver's license (he did) and whether the car was insured (it was not). At most, defendant argued with the officer but eventually cooperated. There was no crime. *Weathington*, 82 Ill. 2d at 187.

¶ 50    Lastly, the State points out that defendant's uncooperative nature made DeYoung apprehensive enough to pull out his Taser and that, because DeYoung was fearful that defendant had something to hide (because of his uncooperative nature), defendant's resistance was criminal. While we agree that an act that places an officer in fear for his safety might significantly impede him, the mere fact that an officer responds in a particular way does not mean a defendant's resistance is material. *Gotschall*, 2022 IL App (4th) 210256, ¶ 30.

¶ 51    The facts here illustrate why. Only defendant and his passenger, Baker, were in his car; there were at least three officers present at the beginning of the stop, and at least five surrounded the car by the end of it. While defendant was uncooperative and argumentative, Baker had fully rolled down *her* window and was speaking politely with DeYoung's partners, both of whom could see into the car and what defendant was doing. None of the other officers took out their

weapons. During the entire stop, everyone's demeanor was relatively calm, and there was no sense of panic. All in all, the police handled the situation with grace and calm, and defendant never threatened the officers in any way—he merely argued with them for a short time. Officer DeYoung was within his right to pull out his Taser in response to defendant's obstinance if he felt it necessary to protect himself. But that alone does not make defendant guilty of resisting.

¶ 52    In sum, the physical acts the State has identified are nothing more than token acts of resistance, if that. Defendant, while obstinate and argumentative, did not materially oppose DeYoung's efforts to remove him from the car to investigate if he had a valid license or car insurance. Whatever resistance he did offer only briefly delayed the officer's efforts. Defendant ultimately complied with their commands, and the police were able to complete their investigation. The evidence here is not sufficient to sustain defendant's conviction for resisting a peace officer.

¶ 53                                    CONCLUSION

¶ 54    Defendant's conviction for resisting a peace officer is reversed.

¶ 55    Reversed.

*People v. Sadder-Bey*, 2023 IL App (1st) 190027

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 18-MC1-210837; the Hon. Adrienne Davis, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Lauren A. Bauser, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham and Brenda K. Gibbs, Assistant State's Attorneys, of counsel (Alazzia Hasty, law school graduate)), for the People. |