No. 2-23-0131
Order filed October 30, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kendall County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 22-CM-42 |
| KATIE M. JACKSON, | ) ) ) | Honorable Carlo D. Colosimo, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court.
Presiding Justice McLaren and Justice Jorgensen concurred in the judgment.

**ORDER**

¶ 1  *Held*:  Defendant was proved guilty beyond a reasonable doubt of both obstructing a peace officer and obstructing a firefighter based on evidence that she blocked a police officer's access to paramedics who were treating her son and that she also interfered with the treatment.

¶ 2  Defendant, Katie M. Jackson, appeals her two convictions of obstructing a peace officer (720 ILCS 5/31-1(a) (West 2020)) and obstructing a firefighter (720 ILCS 5/31-1(a) (West 2020)). She contends that the evidence was insufficient to prove beyond a reasonable doubt that she materially hindered or impeded the performance of any authorized act. Because the evidence

established beyond a reasonable doubt that defendant materially obstructed both a peace officer and a firefighter, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     The State charged defendant via complaint with one count of obstructing a peace officer and one count of obstructing a firefighter. The following facts were established at defendant's bench trial.[1] At about 11:54 p.m. on February 20, 2022, Michael Platt, a firefighter/paramedic for the Little Rock Fox Fire Protection District, responded with his partner to a 911 call of an intoxicated male who was vomiting blood. Officer Rodrigo Ruiz of the Plano Police Department was also dispatched to the scene. When Ruiz arrived at the house, the ambulance was already there, and the paramedics were inside the house. According to witness descriptions, the front door of the house opened into the living room. Beyond the living room was a hallway that led to the family room at the rear of the house.

_____

[1]In its response brief, the State asserts that portions of defendant's statement of facts are argumentative, in violation of Illinois Supreme Court Rule 341(h)(6) (eff. Oct. 1, 2020). The State suggests that we either strike those offending portions or ignore them. See *People v. Olsson*, 2016 IL App (2d) 150874, ¶ 15 (the court may strike or ignore a statement of facts when its review is hindered by improprieties). The State claims that the first paragraph of defendant's fact statement is a summary of her argument, but we read it as merely a synopsis of the case. The State also asserts that her recitation of witness testimony is skewed, but our review is hindered neither by that nor by her omission of the trial court's findings on credibility. Thus, we decline to either strike or ignore these portions of the fact statement.

¶ 5 Ruiz testified that he arrived at the house in his marked squad car with activated emergency lights. He was wearing his full police uniform. After retrieving latex gloves from the ambulance, Ruiz entered the house through the front door.

¶ 6 According to Ruiz, the living room had a couch on the left and, on the right, a coffee table and a television. Ruiz described the space between the couch and the coffee table as "rather narrow." Defendant was standing between the couch and the coffee table, essentially blocking Ruiz's further entry into the house. Defendant "stopped [Ruiz] and told [him] to leave." Ruiz could see down the hallway to the family room, where it appeared that the paramedics were treating someone. Rather than push his way around defendant to get to the paramedics, Ruiz tried to explain to defendant why he was there. He told her that, because there was a report of an intoxicated person, he was there to provide any needed assistance and to protect the paramedics. Instead of climbing across any of the furniture, Ruiz tried to walk around defendant. However, defendant "mirrored [his] movements" and blocked his path. Ruiz continued to explain why he was there. Defendant demanded to see a warrant and said she never called the police. Defendant told Ruiz to leave and tried to call the police chief to have Ruiz removed. When two additional officers arrived, defendant told them to leave as well.

¶ 7 While Ruiz was still in the living room, he saw the patient, later identified as defendant's adult son, Damien Pruitte, grab a paramedic's radio strap and try to pull him down. Damien had his fists clenched and appeared to be violent. At that point, the paramedics shouted, "can you get back here, can you help?" When defendant looked back over her shoulder, Ruiz stepped onto the couch and went around defendant. As he did so, he said, "that's why I'm here."

¶ 8 Ruiz testified that defendant followed him down the hallway and into the family room. Defendant began yelling at the paramedics and the police and telling them to leave. When the

paramedics told her that Damien needed to go to the hospital, she said she did not need their assistance and that she would transport Damien herself. Defendant tried to position herself between the paramedics and Damien.

¶ 9    While the paramedics tried to get Damien out of the house and to the ambulance, Ruiz and another officer handcuffed Damien so that he could not put his hands on anyone. The paramedics eventually got Damien to the ambulance and transported him to the hospital.

¶ 10    On cross-examination, Ruiz testified that the front door was open when he arrived. He estimated that his interaction with defendant in the living room lasted "more than a few minutes." Ruiz admitted that, after he stepped past defendant, she never physically impeded him from performing his duties but just kept yelling. She did, however, physically impede the paramedics from treating Damien by trying to get between them and Damien.

¶ 11    On redirect examination, Ruiz testified that defendant was "standing in the way" in the "narrow" hallway as the paramedics and the police officers (Ruiz and another) escorted Damien toward the living room.

¶ 12    Platt testified that, when he arrived at the house, he was wearing his full firefighter/paramedic uniform. He knocked on the front door, entered the house, and asked what was going on. He "was told to do [his] job" and that Damien was in the back.

¶ 13    Platt and his partner located Damien and other family members in the family room. Damien was sitting on a couch. While Platt was at the arm of the couch attempting to treat Damien, defendant "came in over the arm of the couch and was trying to interrupt as [Platt] was speaking with [Damien]." Defendant was trying to position herself between Platt and Damien. In Platt's opinion, defendant was preventing him from doing his duties.

¶ 14    Ultimately, the paramedics determined that Damien needed to go to the hospital. Because Damien was so intoxicated that he could not stand on his own, the paramedics enlisted the help of defendant's husband and son to help walk Damien down the hallway to the front of the house. As they attempted to move Damien down the hallway, defendant stepped in, blocked the hallway, and said that she did not want Damien to go to the hospital. Because the hallway was already "congested," defendant's position in the hallway prevented the paramedics from getting Damaien to the front door.

¶ 15    On cross-examination, Platt testified that the paramedics were on the scene for 18 minutes, including 15 minutes inside the house. He estimated that defendant blocked the hallway for "[a]bout two minutes" or "[m]aybe a little less." He added that he asked defendant to step out of the way in the hallway, but at that point she was arguing with an officer.

¶ 16    Following the denial of defendant's motion for a directed finding on both charges, Tyrone Jackson, defendant's husband, testified for defendant. According to Tyrone, at about 10:30 or 11:30 p.m. on February 20, 2022, he, defendant, and Damien arrived home from a party. Damien was intoxicated. As Tyrone sat with Damien in the family room, Damien began gurgling. Tyrone grabbed a garbage can from a nearby bathroom. As Damien was vomiting into the garbage can, Tyrone saw what appeared to be blood coming from Damien's mouth. Tyrone told defendant, who called 911 and requested paramedics.

¶ 17    About 10 to 15 minutes later, paramedics arrived. They went to the family room and tried to ask Damien questions. Damien continued gurgling and spitting into the garbage can.

¶ 18    According to Tyrone, as the paramedics were attempting to take Damien's vitals, defendant told the paramedics to take Damien to the hospital. Defendant became frustrated that the

paramedics were not removing Damien. She told them to "forget it" and that she would take him to the hospital herself. The paramedics said, "no, we've got to take him now."

¶ 19 When the paramedics decided to stand Damien up, Tyrone and his son, Tyon, assisted. As they tried to walk Damien down the hallway, he stumbled and fell into one of the paramedics. According to Tyrone, at that point, a police officer rushed in, grabbed Damien, and pushed his head against the wall, knocking pictures down. Defendant screamed, "you're tearing up my house."

¶ 20 As the paramedics and the police officer entered the living room with Damien, one of the paramedics said, "now, [Damien is] going to jail." Defendant responded that Damien needed to go to the hospital, not to jail. According to Tyrone, Damien was not handcuffed, and the paramedics walked him out of the house. When asked if he ever saw defendant physically interfere with either the paramedics or the police, Tyrone answered, "[n]o, not at all." Although Tyrone testified that defendant was in the living room (at the front of the house) during the incident, he admitted on cross-examination that he was not focused on her the entire time. Tyrone also testified that there was a large couch "right next to the front door" and that it was a "tight squeeze to get out the door."

¶ 21 Defendant's son, Tyon, testified that the hallway between the living room and the family room was "[n]arrow." At one point, Damien was in the family room throwing up in a garbage can. Soon thereafter, paramedics entered through the front door and announced themselves as paramedics.

¶ 22 In the family room, the paramedics asked Damien if he was okay and how much he had drunk. After about five to ten minutes, defendant, who was also in the family room, told the paramedics that Damien had thrown up blood and needed to go to the hospital. When the

paramedics questioned Damien, defendant told them that he could not answer because he was "schizophrenic," "delusional," and "drunk." Defendant then said that, if the paramedics were not going to take Damien to the hospital, she would do so.

¶ 23　　At one point, a police officer walked in the front door, and defendant asked who he was. The officer said that he was there for the paramedics. About two minutes later, more police officers arrived.

¶ 24　　The paramedics asked Tyon and Tyrone to help walk Damien out to the ambulance. As Tyon and Tyrone helped Damien down the hallway, Damien was "basically dead weight." At one point in the hallway, the paramedics said that they would take Damien. As Tyon and Tyrone handed Damien off to the paramedics, Daimen stumbled and began to fall. To steady himself, Damien grabbed a paramedic. The paramedic yelled that Damien was grabbing and assaulting him.

¶ 25　　Tyon denied that defendant ever got between the paramedics and Damien in the family room or ever got in the way of the paramedics at all. According to Tyon, defendant only talked and did not yell during the incident.

¶ 26　　Defendant testified that there was a round table, not a coffee table, inside the front door of the house. The hallway from the living room to the family room was "kind of narrow" but wide enough for two people to walk.

¶ 27　　After the family came home on the night of February 20, 2022, defendant yelled at Damien for getting drunk. Damien then went to the family room and sat down. Tyrone sat with him. Defendant went to the living room. At one point, Tyrone came to the living room and told defendant that Damien was vomiting blood. Defendant called 911, reported that her son was intoxicated and throwing up blood, and requested paramedics.

¶ 28    According to defendant, because Damien took medication for schizophrenia and bipolar depression, he was not supposed to consume alcohol. Because he was intoxicated, she was worried that he might die.

¶ 29    Defendant waited outside the front door for the paramedics and was glad to see them when they arrived. She directed them to the family room, but, because she was very upset, she stayed in the living room to maintain her composure. She could not see what was going on in the family room. She locked the front screen door because she did not want the family dog to jump against it and open it.

¶ 30    Shortly thereafter, a police officer grabbed the screen door and pulled it open. Defendant was startled. She recognized the officer as Ruiz; she had "gotten into it with [him] on five different occasions." She asked Ruiz why he was there. She then told him that he needed to knock and announce that he was coming in. When Ruiz asked her why he needed to knock, defendant said it was because he did not pay the rent or live there.

¶ 31    Defendant testified that, as she spoke to Ruiz, she became agitated because he just stared at her and did not say anything. When she told Ruiz that he needed to go back outside and knock and announce, he became very annoyed.

¶ 32    Defendant testified that the living room was "wide" in the area where she was speaking with Ruiz. Defendant denied that Ruiz ever told her to move or that he needed to get by her. Nor did he say that he needed to get to the paramedics. As she called 911 to tell them that she did not need the police, two more police officers walked in. As she was talking to the 911 dispatcher, Ruiz tried to tell her a story about a recent incident involving an intoxicated person. Defendant became "very excited" because she did not want to hear the story; she was fearful that Damien would die.

¶ 33    As defendant spoke to Ruiz in the living room, she could see Platt in the family room, standing and talking with Damien instead of treating him. At that point, she felt that the paramedics, who had been there 25 to 30 minutes, should be taking Damien to the hospital. Platt said something, and Ruiz walked quickly around her. According to defendant, there was nothing preventing Ruiz from going around her.

¶ 34    Defendant then ran back to the family room and told the paramedics that they needed to take Damien to the hospital. Defendant denied that she got between the paramedics and Damien. When Damien said that he did not want to go to the hospital, defendant said that she would take him. Defendant then ordered the paramedics and police out of her house. At this point, she was still "excited," and her voice was not "calm."

¶ 35    The paramedics said that they had to take Damien to the hospital and asked Tyrone and Tyon to help get Damien to the ambulance. In the hallway, Damien stumbled. To keep from falling, he grabbed the belt across Platt's chest. Platt then said that Damien was assaulting him and that Damien would be going to jail. According to defendant, all the police officers then rushed into the hallway, grabbed Damien, and threw him against the wall, smashing his head against the wall. Defendant told them that they were tearing up her house.

¶ 36    The officers then held up Damien and pushed him out the front door. Two officers prevented defendant from leaving the front porch. According to defendant, Damien yelled from his gurney that defendant had not done anything. On cross-examination, defendant denied ever blocking Ruiz.

¶ 37    The trial court found defendant guilty of both obstruction charges. In doing so, the court found that, although defendant testified that the opening in the living room near the front door was "wide," her description was inconsistent with both Tyrone's testimony that it was a "tight squeeze"

and Ruiz's testimony that the area was "rather narrow." Further, Ruiz testified that he could not get around defendant without going over the couch. Accordingly, the court believed Tyrone and Ruiz that the opening was narrow; the court discounted defendant's description as an embellishment meant to suggest that Ruiz could get around her. The court found that defendant obstructed Ruiz when she delayed him from getting to the paramedics to render assistance and provide protection.

¶ 38    The court also found that defendant obstructed Platt by trying to get between him and Damien while he was treating Damien and by later blocking the hallway for almost two minutes.

¶ 39    Following the denial of defendant's motion for a new trial, the trial court sentenced defendant to 12 months' conditional discharge and 100 hours of community service. Defendant, in turn, filed this timely appeal.

¶ 40                                  II. ANALYSIS

¶ 41    Defendant contends that we must reverse her convictions because the evidence was insufficient to prove beyond a reasonable doubt that she materially obstructed either a firefighter or a peace officer.

¶ 42    "In any challenge to the sufficiency of the evidence, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Taylor*, 2012 IL App (2d) 110222, ¶ 8. "The determination of the weight to be given the witnesses' testimony, their credibility, and the reasonable inferences to be drawn from the evidence are the responsibility of the trier of fact." *Taylor*, 2012 IL App (2d) 110222, ¶ 8.[2] "This standard applies

_____

[2]We note that defendant, in her reply brief, states that she "accepts the [trial] court's

whether the evidence is direct or circumstantial and whether the judgment is the result of a jury trial or a bench trial." *Taylor*, 2012 IL App (2d) 110222, ¶ 8.

¶ 43    Under section 31-1(a) of the Criminal Code of 2012 (720 ILCS 5/31-1(a) (West 2020)), a person commits the offense of obstructing a peace officer or firefighter when that person "knowingly *** obstructs the performance by one known to the person to be a peace officer [or] firefighter[ ] *** of any authorized act within his or her official capacity[.]" The State must prove that the "obstruction or resistance actually impeded or hindered the officer [or firefighter] from conducting an act that he or she was authorized to perform." *People v. Sadder-Bey*, 2023 IL App (1st) 190027, ¶ 26.

¶ 44    Our supreme court has commented on section 31-1:

> "[S]ection 31-1 does not particularize all of the types of obstructive conduct that may fall within its purview. [Citation.] Rather, the legislature has chosen to frame the provision *** in broad terms within the confines of free speech, rights of assembly and other constitutional concerns. Although a person may commit obstruction of a peace officer by means of a physical act, this type of conduct is neither an essential element of nor the exclusive means of committing an obstruction. The legislative focus of section 31-1(a) is on the tendency of the conduct to interpose an obstacle that impedes or hinders the officer in the performance of his authorized duties. That inquiry is for the trier of fact, based upon the facts and circumstances of each case. [Citation.]" *People v. Baskerville*, 2012 IL 111056, ¶ 23.

---

credibility findings, but those findings are not germane to the issue of whether a material impediment occurred."

¶ 45    Case law also supports a materiality component under section 31-1.  In *Baskerville*, the court held that providing false information to a peace officer "may constitute obstruction under section 31-1(a) when the misinformation interposes an obstacle that impedes or hinders the officer and is relevant to the performance of his authorized duties."  *Baskerville*, 2012 IL 111056, ¶ 29. In *People v. Casler*, 2020 IL 125117, ¶ 41, the court noted that section 31-1 and section 31-4, the obstruction-of-justice statute (see 720 ILCS 5/31-4(a)(1) (West 2014)) are "related in that section 31-1 targets acts that obstruct police officers, while section 31-4 targets specific acts that constitute obstructive conduct, one of which is furnishing false information."  The court had held in *People v. Comage* that obstruction of justice requires proof that the defendant "actually interfere[d] with the administration of justice, *i.e.*, *materially impede[d]* the police officers' investigation." (Emphasis added.)  241 Ill. 2d 139, 150 (2011).  The court reaffirmed in *Casler* that "a defendant's acts must be a *material impediment* and must be proved in a prosecution for obstructing justice." (Emphasis added.)  *Casler*, 2020 IL 125117, ¶ 41.

¶ 46    We read *Casler*, *Baskerville*, and *Comage* as supporting a materiality requirement under section 31-1(a) for *any* type of obstructive conduct, not just the giving of false information, which was the type of obstruction charged in *Baskerville*.  We are not alone in that interpretation.  See *People v. Gotschall*, 2022 IL App (4th) 210256, ¶ 27 ("In the context of the offense of obstructing a peace officer, the supreme court decisions in *Comage*, *Baskerville*, and *Casler*, taken together, lead us to conclude that the material impediment requirement set forth in *Baskerville* should logically apply to any obstructive conduct alleged to have hindered or impeded authorized acts of peace officers in violation of [section 31-1(a)]."); *People v. Mehta*, 2020 IL App (3d) 180020, ¶ 26 ("We *** hold that obstruction of a peace officer is committed only where a defendant's conduct creates an obstacle that materially impedes or hinders the officer in the performance of his

authorized duties. [Citation.]" (internal quotation marks omitted)); accord *Sadder-Bey*, 2023 IL App (1st) 190027, ¶ 40. Thus, we hold that, under section 31-1(a), the State must prove beyond a reasonable doubt that the alleged obstructive conduct materially hindered or impeded a peace officer, firefighter, or correctional officer from performing any authorized act.[3]

¶ 47    We now address whether the evidence here was sufficient to prove beyond a reasonable doubt that defendant's conduct materially hindered or impeded both Ruiz and Platt from performing any authorized act. It was.

¶ 48    We first consider defendant's conduct as it related to Ruiz. The evidence established that Ruiz responded to a 911 call for a medical emergency. He testified that his official duties in responding to the call included assisting the paramedics, if needed, with their medical treatment and protecting them from assaultive or criminal conduct. Thus, Ruiz was authorized to enter the house and accompany the paramedics as they performed their duties. Defendant does not contend otherwise.

¶ 49    Upon entering the house, Ruiz was confronted by defendant, who immediately challenged his authority to be in the house. Although merely challenging Ruiz's authority to enter her house might not have constituted material obstruction, defendant positioned herself to effectively block Ruiz from entering further into the home—particularly, from accessing the room in which the paramedics were treating Damien. Ruiz testified that defendant positioned herself in the narrow space between the couch and the coffee table. Tyrone agreed that it was a "tight squeeze" to get

---

[3]We note that the State does not disagree that there must be proof of a material obstruction under section 31-1(a) and, indeed, expressly "agree[s] with" defendant's reliance on the holdings of *Gotschall* and *Mehta*.

from the front door across the living room. Where she stood, defendant prevented Ruiz from getting to the paramedics without either physically moving defendant or disrupting the furniture. To Ruiz's credit, he opted for neither, first attempting to reason with defendant. Only after it appeared that the paramedics were at risk of an assault did Ruiz, seeing that defendant was distracted, climb over the couch to get to the family room. Although defendant's conduct in blocking Ruiz from going down the hallway to the paramedics lasted for only "a few minutes," it delayed Ruiz from assisting the paramedics in providing medical care to Damien and from protecting the paramedics from possible assault or injury. Indeed, Damien was extremely intoxicated, which created difficulties in treating him and presented a heightened risk of danger to the paramedics.

¶ 50    Additionally, defendant further hindered or impeded Ruiz while he was assisting the paramedics in getting Damien down the narrow hallway and to the ambulance. According to Platt, as they were trying to help Damien down the hallway, defendant blocked the hallway, saying that she did not want them to take Damien to the hospital. Again, although defendant hindered or impeded Ruiz's attempt to assist Damien's treatment for "[a]bout two minutes" or "[m]aybe a little less," Damien was seriously ill (extremely intoxicated and vomiting blood), and such a delay clearly put him at risk. Indeed, defendant testified that she thought Damien might die because of his consumption of alcohol and medications. Accordingly, when defendant blocked the hallway, she materially hindered Ruiz in the performance of his official duties. Thus, the evidence proved beyond a reasonable doubt that defendant materially obstructed Ruiz.

¶ 51    Of course, in blocking the hallway, defendant also materially obstructed Platt, who likewise was attempting to get Damien down the hallway and to the ambulance. As discussed, defendant's actions in blocking the hallway effectively delayed the further treatment of Damien in the

ambulance and at the hospital. That alone constituted a material obstruction of Platt's official duties.

¶ 52 Further, according to Platt and Ruiz, defendant tried to position herself between Platt and Damien on the couch in the family room while Platt was attempting to treat Damien. When she did so, she interfered with Platt's ability to question Damien, which was certainly part of Platt's attempt to treat Damien. Additionally, defendant delayed the treatment process by objecting to Platt taking Damien to the hospital and insisting that she do so. As noted, such delay in Damien's treatment put him at further medical risk. Defendant's conduct both in the family room and in the hallway materially hindered Platt from performing his official duty of providing medical care to Damien.

¶ 53 For the foregoing reasons, we hold that the evidence proved beyond a reasonable doubt that defendant materially obstructed both Ruiz and Platt from performing their official duties. Thus, she was properly found guilty of both charges.

¶ 54                                  III. CONCLUSION

¶ 55 For the reasons stated, we affirm the judgment of the circuit court of Kendall County.

¶ 56 Affirmed.