2024 IL App (2d) 230149-U
No. 2-23-0149
Order filed February 8, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 19-CM-472 |
| SAMMY OSMAN, | ) ) | Honorable Rene Cruz, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE MULLEN delivered the judgment of the court.
Presiding Justice McLaren and Justice Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) The trial court did not err in giving unmodified versions of the Illinois pattern jury instructions on obstructing a peace officer where the case did not involve unusual facts or new law. (2) The evidence was sufficient to prove defendant guilty of (a) obstructing a peace officer where defendant refused to obey various commands when the police responded to a business where a burglary was reported to be in progress and (b) criminal trespass to real property where defendant and his mother, an employee of the business, were discovered on the premises at nearly midnight, after the business owner had given them notice not to enter the business after-hours.

¶ 2    Defendant, Sammy Osman, appeals his convictions for obstructing a peace officer (720 ILCS 5/31-1(a) (West 2018)) and criminal trespass to real property (720 ILCS 5/21-3(a)(2) (West

2018)). He contends that (1) he was not proved guilty beyond a reasonable doubt of obstructing a peace officer, (2) the trial court committed plain error in giving unmodified versions of the pattern criminal jury instructions on obstructing a peace officer, (3) his trial counsel was ineffective for failing to object to the pattern instructions, and (4) the State did not prove an essential element of criminal trespass to real property, *i.e.*, that he had received prior notice that he was not allowed on the property. Because the evidence was sufficient to prove him guilty of both offenses and there was no error in the jury instructions on obstructing a peace officer, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      The State charged defendant in an amended complaint with (1) one count of obstructing a peace officer—specifically, by impeding the police investigation of an in-progress burglary by not following the lawful orders of a peace officer, Office Sproles, " 'to show himself and to drop a blunt object from his hands while approaching officers' " (720 ILCS 5/31-1(a) (West 2018))[1] and (2) one count of criminal trespass to real property by knowingly entering onto the property after receiving prior notice that entrance was forbidden (720 ILCS 5/21-3(a)(2) (West 2018)).

¶ 5      The following facts were developed at defendant's jury trial. At about 11:49 p.m. on February 6, 2019, Officer Shawn Sproles and several other Elgin police officers were dispatched

---

[1]We note that, in the original complaint, the State alleged in count I that defendant obstructed a peace officer when he (1) "did not follow the lawful orders of police officers to show himself after being warned that failure to do so will result in arrest" and (2) "did not follow orders to drop [a] blunt object from his hands and approached officers, resulting in a less than lethal projectile being discharged upon him." The trial court granted the State's motion to amend the complaint to read as stated above.

to a business complex in Elgin to investigate a telephone report of a possible burglary in progress. Sproles, the first officer to arrive, checked the exterior of the locked building. In doing so, he observed what he thought was a female with a flashlight inside The Hairy Hound, one of the businesses in the building. When Sproles knocked on the window and announced himself, the individual "ducked into" what appeared to be a closet. Sproles spoke on the telephone to the original caller, who confirmed that he had seen two people enter the building.

¶ 6    After the other officers arrived, they and Sproles checked the building's exterior and found no signs of forced entry. The owner of the building was called and arrived about 30 to 40 minutes later. He opened the main door and gave the police keys to the interior businesses, including The Hairy Hound.

¶ 7    Sproles testified that the police entered the building. Because they believed that someone was in The Hairy Hound, the officers decided, for safety, to ensure that no one else was in the building before they entered The Hairy Hound. While searching the remainder of the building, the officers announced their presence and told any occupants to come out and show their hands.

¶ 8    Sproles stated that, after the officers found no one in other parts of the building, they arrived at the entrance to The Hairy Hound. After they unlocked the door, Chad Schuttrow, the K-9 officer at the scene, announced his presence and commanded the occupants to come out. Schuttrow gave at least three such commands before a man stepped out. He was later identified as defendant. Defendant had a blunt object in his hand and did not follow further police commands to drop the object. Sproles recalled that he himself commanded defendant more than once to drop the object, but defendant did not comply. Sproles could not identify the object then but later learned it was a red Bluetooth speaker. Because defendant was not complying with police commands, Officer Teodolo Ravadan discharged a nonlethal weapon that fired a 40-millimeter, soft-point projectile.

Although the projectile struck defendant in the leg, he did not immediately comply; rather, Sproles gave three or four more commands before defendant dropped the object and got on the floor. After defendant was on the floor, Paula Osman (Paula), defendant's mother, stepped out in front of defendant. According to Sproles, once defendant was on the floor, it "only took about a minute" for the officers to handcuff him.

¶ 9    On cross-examination, Sproles estimated that Ravadan fired his weapon a minute after he entered The Hairy Hound. Sproles testified that, after the police commands, defendant "eventually" dropped the object, got down on his knees and showed his hands, and then got on his stomach. Sproles could not recall defendant raising his arm to either throw the object at the officers or stab them with it.

¶ 10    The State played the video from Sprole's body camera, which depicted, among other things, the encounter with defendant. The counter on the video showed that defendant got on his stomach nearly three minutes after Schuttrow entered The Hairy Hound. During that time, several officers commanded defendant to show himself, drop the object in his hands, and get on his stomach.

¶ 11    Schuttrow testified that, when he arrived at the scene, he and his K-9 dog assisted the other officers in clearing the rest of the building before proceeding to The Hairy Hound. During the search, Schuttrow gave two sets of three announcements, each stating that the police were present and that the occupants must make themselves known or the dog would be sent. The announcements were "very loud" so that they could be heard over the dog's barking. After each announcement, Schuttrow silenced the dog so that he could hear any responses. When the officers reached the door of The Hairy Hound, they unlocked the door and Schuttrow stood in the doorway, giving another set of announcements. After hearing something fall inside the premises, the officers

ordered anyone inside to show themselves. Defendant stepped into view about 20 feet from the front entrance. According to Schuttrow, defendant was wearing a backpack and held an unidentified object in his hand. Schuttrow told defendant to drop the object, but he refused. Because the dog was barking loudly at this point, Schuttrow removed himself and the dog from the interior of The Hairy Hound, and Ravadan took the lead. After he and his dog exited, Schuttrow could no longer see defendant.

¶ 12    On cross-examination, Schuttrow estimated that Ravadan fired his weapon about 10 to 15 seconds after Schuttrow entered The Hairy Hound. He admitted the dog was barking loudly but explained that this was to gain defendant's compliance. On redirect examination, he testified that, during the 10 to 15 seconds before Ravadan shot defendant, both he and Ravadan gave several commands to defendant to drop the object, but he refused. On recross-examination, Schuttrow admitted that he never saw defendant attempt to throw the object at the officers or threaten to stab them with it.

¶ 13    Ravadan testified that, after Schuttrow entered The Hairy Hound, Ravadan entered and positioned himself to see defendant. Eventually, Ravadan took over and was in front of Schuttrow.

¶ 14    According to Ravadan, defendant was at the back of a hallway, about 15 feet from Ravadan. He was wearing a backpack and holding an object in his hand. Ravadan could not tell the nature or color of the object at that time. Ravadan ordered defendant several times to show his hands, but he refused. Defendant eventually dropped the backpack but not the object in his hand. Ravadan then pointed his nonlethal weapon at defendant and told him several times to show his hands and drop the object. Instead of dropping the object, defendant turned sideways, with the hand that held the object now behind him and out of view. He then raised the hand that held the object. At that point, Ravadan shot defendant in his left thigh with a soft, sponge-point bullet. After being hit,

defendant did not immediately drop the object and "continued to be belligerent towards [the] officers." Ravadan reloaded and told defendant several times to get on the floor, or he would be shot again. Defendant then dropped the object and got on the floor. However, after getting on the floor, defendant remained on his knees and refused to lie on his stomach despite being ordered to do so. "Eventually," defendant went down on his stomach, but then he started doing pushups while continuing to yell at the officers. After defendant got on the floor, a female, later identified as Paula, stepped out. She complied with police commands and was removed from the area. Defendant "eventually" stopped doing pushups. For safety, he was handcuffed only after Paula had been arrested.

¶ 15    The State played the video from Ravadan's body camera. On cross-examination, Ravadan admitted that the video showed that defendant dropped the object approximately 13 seconds after Ravadan entered The Hairy Hound. Ravadan further admitted that he fired his weapon about eight or nine seconds after he entered. He acknowledged, too, that defendant dropped the object "a few seconds" after Ravadan fired the weapon. Ravadan's body camera video showed that several minutes passed from when Ravadan entered The Hairy Hound to when defendant finally complied with the command to lie on his stomach.

¶ 16    Beatrice Papanicolaou, the owner of The Hairy Hound, testified that Paula was employed at The Hairy Hound at the time of the incident and had worked there for about nine months. She began as a full-time employee but, "towards the end," she was down to part-time work. Defendant was Paula's son. Paula had a key to the business because she would occasionally open before Papanicolaou arrived. The business generally closed around 5 or 6 p.m.

¶ 17    Because Papanicolaou had received multiple complaints about people being inside The Hairy Hound after-hours, she had "conversations with both [Paula and defendant]." She told them

"several times that [they] [could] not be [there] after hours." She specifically remembered that defendant was present when she said that he and Paula were not to enter The Hairy Hound after-hours. Defendant was present because he would pick up Paula from work. When asked if she remembered the last time she had told them they could not enter The Hairy Hound after-hours, she answered that she could not recall the exact date because "it was so long ago." She added that she might have last reminded Paula on February 5, 2019, the day before the incident, or "somewhere around that time." Papanicolaou acknowledged that she occasionally boarded dogs at The Hairy Hound and asked Paula to remain after-hours to care for the dogs. However, no dogs were being boarded on the day of the incident. Papanicolaou did not recall exactly the last day Paula had worked before the incident, but it might have been that same day.

¶ 18    On cross-examination, Papanicolaou testified that the complaints about people being in The Hairy Hound after-hours came from business owners in the same building and business owners from across the street. The complaining owners were concerned about their property. Papanicolaou had no written documentation of the complaints because the area was small and the group of owners was "tight knit." Papanicolaou reiterated that she had told Paula and defendant several times that they were not to enter The Hairy Hound after-hours. Papanicolaou added, "The last time I told them was the last time I seen [Paula], which I don't know if she worked, and I told her that she cannot be there after hours because there's people complaining." When she most recently admonished Paula on that point, Paula promised that she would do as Papanicolaou said. Because "it's been so long," Papanicolaou could not recall the exact date she told defendant not to enter The Hairy Hound after-hours. She did not give Paula or defendant a written notice or keep a written record of orally admonishing them. When asked if she had told the police that she had warned defendant not to enter The Hairy Hound after-hours, she implied that she did not tell them

because defendant did not work for her. Papanicolaou did not recall telling the police she did not like Paula and wanted her gone.

¶ 19    On redirect, Papanicolaou testified that, because The Hairy Hound closed at 5 or 6 p.m. and no dogs were boarded on February 6, 2019, there was no reason for anyone to be there at 11 p.m. that night. When asked how long before the incident she last told defendant that he was not allowed there after-hours, she responded that she did not recall because "[i]t was so long ago." She speculated that it might have been the same day that she last told Paula, as she and defendant were always together.

¶ 20    The trial court instructed the jury on, *inter alia*, the definition of obstructing a peace officer (see Illinois Pattern Jury Instructions, Criminal, No. 22.13 (approved May 4, 2018) (hereinafter IPI Criminal No. 22.13)) and the elements to be proven for that offense (see Illinois Pattern Jury Instructions, Criminal, No. 22.14 (approved May 4, 2018) (hereinafter IPI Criminal No. 22.14)). Defendant neither objected to these instructions nor offered any alternative instructions. The definitional instruction read:

> "A person commits the offense of resisting or obstructing a peace officer when he knowingly resists or obstructs the performance of any authorized act within the official capacity of one known to him to be a peace officer." See IPI Criminal No. 22.13.

The elements instruction read:

> "To sustain the charge of resisting or obstructing a peace officer[,] the State must prove the following propositions:
>
> > *First Proposition*: That Officer Shawn Sproles was a peace officer; and
> >
> > *Second Proposition*: That the defendant knew Officer Shawn Sproles was a peace officer; and

*Third Proposition*: That the defendant knowingly resisted or obstructed the performance by Officer Shawn Sproles of an authorized act within his official capacity.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty." See IPI Criminal No. 22.14.

¶ 21 The jury found defendant guilty of both counts. Following the denial of defendant's motion for a new trial, in which he did not challenge the jury instructions, the trial court sentenced defendant to 12 months' conditional discharge on the obstruction conviction, 12 months' court supervision on the criminal trespass conviction, and 100 hours of community service on each conviction, to run concurrently. Defendant, in turn, filed this timely appeal.

¶ 22                                    II. ANALYSIS

¶ 23 On appeal, defendant contends that (1) the State did not prove him guilty beyond a reasonable doubt of obstructing a peace officer, (2) the trial court committed plain error when it tendered pattern jury instructions on obstructing a peace officer that were not modified to specify Officer Sproles's authorized act(s) or defendant's illegal conduct, (3) his trial counsel was ineffective for failing to object to the instructions on obstructing a peace officer, and (4) the State failed to prove beyond a reasonable doubt an essential element of criminal trespass to real property, *i.e.*, that defendant had received prior notice that he was not allowed on the property.

¶ 24 We address defendant's challenges in a different order than he presents them.

¶ 25 A. Jury Instructions on Obstructing a Peace Officer and Ineffective Assistance of Counsel

¶ 26    We begin with defendant's contention that the trial court erred in giving the pattern jury instructions on obstructing a peace officer without modifying them to limit the material conduct to that charged in the amended complaint (*i.e.*, defendant's failure to show himself and drop the object from his hand). We begin by noting that defendant forfeited this claim as he did not object to the instructions, or tender an alternative, in the trial court. Generally, no party may challenge on appeal the failure to give an instruction unless the party had tendered it. Ill. S. Ct. R. 366(b)(2)(ii) (eff. Feb. 1, 1994). However, under Illinois Supreme Court Rule 451(c) (eff. Apr. 8, 2013), "substantial defects [in jury instructions] are not waived by failure to make timely objections thereto if the interests of justice require." "The purpose of Rule 451(c) is to permit correction of grave errors and errors in cases so factually close that fundamental fairness requires that the jury be properly instructed." *People v. Sargent*, 239 Ill. 2d 166, 189 (2010). The rule is coextensive with the plain-error rule in Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967). *Sargent*, 239 Ill. 2d at 189. Before conducting a plain-error analysis, we must first determine whether there was any error. *People v. Wilson*, 404 Ill. App. 3d 244, 247 (2010).

¶ 27    The purpose of jury instructions is to provide the jury with the correct legal principles applicable to the evidence, so that the jury may reach a correct conclusion according to the law and the evidence. *People v. Bannister*, 232 Ill. 2d 52, 81 (2008). The correctness of a jury instruction depends not on whether defense counsel can imagine a problematic meaning, but on whether ordinary persons acting as jurors would fail to understand it. *Bannister*, 232 Ill. 2d at 81. When an IPI criminal instruction applies in a criminal case, it shall be used unless the court determines it does not accurately state the law. Ill. S. Ct. R. 451(a) (eff. Apr. 8, 2013). The IPI instructions should be used because they have been painstakingly drafted and trial judges should not second guess the drafting committee where the instruction clearly applies. *People v. Durr*, 215

Ill. 2d 283, 301 (2005). Accordingly, a trial court may deviate from the pattern instruction and format " 'only where necessary to conform to unusual facts or new law.' " *People v. Anderson*, 2012 IL App (1st) 103288, ¶ 40 (quoting *People v. Banks*, 287 Ill. App. 3d 273, 280 (1997)). Although deciding whether to give a certain instruction is generally a matter of discretion, when the issue is whether the instruction accurately conveys the applicable law, the proper standard of review is *de novo*. *People v. Pierce*, 226 Ill. 2d 470, 475 (2007).

¶ 28    Here, the trial court did not err in giving the pattern instructions defining obstruction of a peace officer and setting forth the elements to be proven. There is no question that the pattern instructions accurately conveyed the applicable law. Further, the instructions were consistent with the charged offenses. There were neither unusual facts nor new law. The State produced evidence that defendant refused to comply with clear police commands to show himself and drop the object. The evidence matched the amended complaint's allegations. Indeed, the jury had been apprised of the allegations of the amended complaint during voir dire, opening statements and closing arguments and was fully aware of what conduct was alleged to support an obstruction charge. Additionally, any variance between the evidence and the allegations of the amended complaint was neither material nor such that defendant was either misled in his defense or subject to double jeopardy. See *People v. Lattimore*, 2011 IL App (1st) 093238, ¶ 67. Although the evidence included instances of obstructive conduct beyond that alleged in the amended complaint (such as defendant's refusal to lie on the floor), those variances merely elaborated upon how defendant committed the underlying offense and did not deprive him of notice of the charge. See *Lattimore*, 2011 IL App (1st) 093238, ¶¶ 67, 70. Accordingly, the jury could properly rely on that uncharged conduct to find defendant guilty beyond a reasonable doubt. See *Lattimore*, 2011 IL App (1st) 093238, ¶ 67. Nor was the indictment lacking any material detail such that defendant could not

defend against a future prosecution based on the same facts. See *Lattimore*, 2011 IL App (1st) 093238, ¶ 71. Finally, this case did not involve any new law. We conclude that the use of the unmodified IPI Criminal Nos. 22.13 and 22.14 was proper.

¶ 29    Further, although defendant cites several cases in support of his assertion that the unmodified pattern instructions did not accurately state the law, all of these cases are distinguishable because they address the sufficiency of a charging instrument. See *People v. Stoudt*, 198 Ill. App. 3d 124 (1990); *People v. Gerdes*, 173 Ill. App. 3d 1024 (1988); *People v. Leach*, 3 Ill. App. 3d 389 (1972).

¶ 30    Because no error occurred in using the pattern instructions, there was no "grave error" that would support review under Rule 451(c). See *Sargent*, 239 Ill. 2d at 189. Thus, we uphold defendant's forfeiture of his argument. It follows that because it was not error to give IPI Criminal Nos. 22.13 and 22.14, trial counsel was not ineffective for failing to either object or tender alternative instructions.

¶ 31                                   B. Sufficiency of the Evidence

¶ 32    We turn to defendant's arguments on the adequacy of the State's evidence to support his convictions.

¶ 33    In any challenge to the sufficiency of the evidence, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Taylor*, 2012 IL App (2d) 110222, ¶ 8. This standard applies whether the evidence is direct or circumstantial and whether the judgment resulted from a jury or a bench trial. *Taylor*, 2012 IL App (2d) 110222, ¶ 8. Determining the weight to be given to the witnesses' testimony, their credibility, and the reasonable inferences to be drawn from the evidence are the responsibilities of the trier of fact.

*Taylor*, 2012 IL App (2d) 110222, ¶ 8. Thus, we may not substitute our judgment for that of the trial court on such matters. *People v. Sutherland*, 155 Ill. 2d 1, 17 (1992).

¶ 34    The amended complaint charged defendant with obstructing Sproles. The elements of obstructing a peace officer are that the defendant (1) knowingly obstructed someone he knew was a peace officer and (2) the obstruction actually impeded or hindered the officer from performing any authorized act within his or her official capacity. 720 ILCS 5/31-1(a) (West 2018); see *People v. Sadder-Bey*, 2023 IL App (1st) 190027, ¶ 26.

¶ 35    Based on its plain language, section 31-1 of the Criminal Code of 2012 (Code) (720 ILCS 5/31-1 (West 2018)) does not particularize all the types of obstructive conduct that might fall within its purview. *People v. Baskerville*, 2012 IL 111056, ¶ 23. Rather, the legislature chose to frame that provision in broad terms, confined only by the rights of free speech, assembly, and other constitutional concerns. *Baskerville*, 2012 IL 111056, ¶ 23. Although a person might commit obstruction of a peace officer via a physical act, such conduct is neither an essential element of, nor the exclusive means of committing, an obstruction. *Baskerville*, 2012 IL 111056, ¶ 23. The legislative focus of section 31-1(a) is on the tendency of the conduct to interpose an obstacle that impedes or hinders an officer's performance of his authorized duties. *Baskerville*, 2012 IL 111056, ¶ 23. Put another way, the offense of obstructing a peace officer does not require proof of a physical act. *Baskerville*, 2012 IL 111056, ¶ 29.

¶ 36    Further, any obstruction must materially impede the officer's performance of an authorized act. *People v. Gotschall*, 2022 IL App (4th) 210256, ¶ 27; *People v. Mehta*, 2020 IL App (3d) 180020, ¶ 26; see also *People v. Casler*, 2020 IL 125117, ¶ 41 (reaffirming that the defendant's acts must be a material impediment) (citing *Baskerville*, 2012 IL 111056, ¶ 23; *People v. Comage*,

241 Ill. 2d 139, 150 (2011)). Whether a defendant obstructed a peace officer is for the trier of fact to decide based on the facts and circumstances of each case. *Baskerville*, 2012 IL 111056, ¶ 23.

¶ 37    Here, the evidence established that Sproles was attempting to investigate the report of a possible burglary in progress. That was undoubtedly an authorized act within his official capacity. Nor is there any issue that defendant knew that Sproles was a peace officer. Rather, the only issue raised by defendant is whether the evidence proved that he materially impeded Sproles in that regard. It did.

¶ 38    The evidence showed that once the officers entered The Hairy Hound, they loudly announced their presence and ordered anyone inside to show themselves. Defendant did not immediately comply, as it took several commands from Schuttrow before defendant finally stepped into view. Once he did, several officers, including Sproles, ordered him to drop an unidentified object from his hand and lie on his stomach on the floor. Defendant did not immediately comply; rather, he dropped the object only after repeated commands, a shot in the leg with a soft-tipped bullet, and a threat to shoot him a second time in the same manner. However, even after dropping the object, defendant still refused to get on the floor and lie on his stomach. After several more commands to do so, he got on his knees but still refused to lie down. Finally, after still more commands, defendant got on his stomach but then began doing pushups. Only after several more commands did defendant finally lie still so that the officers could safely handcuff him. This course of conduct—which included defendant's refusal (as charged) to promptly show himself and drop the object, despite numerous commands—occurred over several minutes and prevented Sproles from proceeding with his burglary investigation. Thus, this conduct materially impeded and hindered Sproles's performance of an authorized police function.

¶ 39   Defendant argues that the approximately 13-second interval between the police commands that he drop the object and his compliance was too brief to constitute a material impediment or hindrance. We are unpersuaded.

¶ 40   First, the amount of time alone is not dispositive of whether conduct materially impedes or hinders a peace officer, as that issue depends on the totality of the facts of any given case. *Baskerville*, 2012 IL 111056, ¶ 23; see also *People v. Shenault*, 2014 IL App (2d) 130211, ¶ 22 (neither *Baskerville* nor *Taylor* categorically held that the degree of obstruction is measured by only the amount of time necessary for a peace officer to overcome the defendant's conduct). Further, during an ongoing burglary investigation, an unidentified object in a suspect's hand for even a short time is particularly dangerous and, here, clearly thwarted the progress of the investigation until the potential danger was resolved. See *People v. McGhee*, 2020 IL App (3d) 180349, ¶ 61 (burglary is dangerous because it creates the possibility of a violent confrontation between the offender and an occupant or a person who comes to investigate) (citing *Quarles v. United States*, 587 U.S. ___, ___,139 S. Ct. 1872, 1879 (2019)). As the court stated in *People v. Synnott*, 349 Ill. App. 3d 223, 228 (2004), "[i]t seems clear that any behavior that actually threatens an officer's safety or even places an officer in fear for his or her safety is a significant impediment to the officer's performance of his or her duties." Accordingly, defendant's refusal, if only for 13 seconds, to drop the object after several commands to do so heightened the danger of the situation and effectively prevented Sproles from proceeding with the investigation until that danger was resolved.

¶ 41   Second, the relevant time here spanned well beyond 13 seconds. As discussed, defendant took several minutes to fully comply with officers' commands that he show his hands, drop the object, and lie on the floor so that he could be handcuffed. We cannot parse out the time that it

took to comply with one set of police commands from the total time it took for defendant to comply with all of the commands. Thus, the time it took for defendant to drop the object does not alone show that defendant was not proved guilty beyond a reasonable doubt of obstructing a peace officer.

¶ 42    We next address whether defendant was proved guilty beyond a reasonable doubt of criminal trespass to real property. Specifically, we must determine whether the evidence established that defendant was given prior notice that he was prohibited from after-hours entry into The Hairy Hound.

¶ 43    To obtain a conviction for criminal trespass to real property under section 21-3(a)(2) of the Code (720 ILCS 5/21-3(a)(2) (West 2018)), the State had to prove beyond a reasonable doubt that, before defendant entered The Hairy Hound, he had received notice from the owner or occupant that such entry was forbidden. A defendant has received such notice if he has been personally notified, either in writing or orally. 720 ILCS 5/21-3(b) (West 2018). The defendant must know that he was told not to enter. *People v. Chai*, 2014 IL App (2d) 121234, ¶ 34.

¶ 44    Here, Papanicolaou testified that, because she had received complaints about people being inside The Hairy Hound after-hours, she personally told both defendant and Paula "several times" that they were not to enter The Hairy Hound after-hours. Further, we note that, even if she had not told defendant more than once that he was not to enter the establishment after-hours, it was reasonable to conclude that, if Paula, an employee, was not allowed there after-hours, then neither was defendant, a non-employee. Additionally, although Papanicolaou could not specifically recall how long before the incident she had last admonished them, it could not have been longer than the nine months that Paula had been working at The Hairy Hound at the time of the incident. More importantly, section 21-3(a)(2) does not expressly require that the notice be given within a certain

time of the entry. Additionally, Papanicolaou's inability to recall the exact date when she last notified defendant that he was not to enter The Hairy Hound after-hours did not materially detract from her credibility, as she explained that it had been too long ago to recall the exact date.

¶ 45     Thus, because the owner, Papanicolaou, testified that she personally notified defendant before the incident that he was not to enter The Hairy Hound after-hours, the jury could reasonably rely on that testimony to find beyond a reasonable doubt that defendant had received the personal notice required to prove criminal trespass to real property.

¶ 46                                III. CONCLUSION

¶ 47     For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 48     Affirmed.