NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (4th) 240510-U

NO. 4-24-0510

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 16, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Winnebago County |
| JANISHIA LATONYA NICOLE TOMLINSON, | ) | No. 22CF1258 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Randy Wilt, |
| | ) | Judge Presiding. |

JUSTICE GRISCHOW delivered the judgment of the court.
Justices Lannerd and Knecht concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed, finding the State proved beyond a reasonable doubt defendant was guilty of resisting a peace officer and the jury was properly instructed as to the law regarding resisting a police officer.

¶ 2    Defendant, Janishia Latonya Nicole Tomlinson, was convicted after a jury trial of domestic battery (720 ILCS 5/12-3.2(a)(1) (West 2022)) and resisting a peace officer (*id.* § 31-1(a)), and she was sentenced to 180 days in jail (stayed) and 24 months of conditional discharge. Defendant argues her conviction for resisting a peace officer should be reversed because the State failed to prove she materially interfered with the officer's efforts to arrest her, and alternatively, her conviction should be vacated and the case remanded for a new trial because the jury should have been instructed that the State was required to prove beyond a reasonable doubt that defendant's conduct materially impeded the officer. We affirm.

¶ 3                                          I. BACKGROUND

¶ 4          The State filed a four-count complaint against defendant based on a domestic incident that occurred on May 29, 2022, involving her 13-year-old daughter, J.L. (born May 2009). A true bill of indictment on all four charges was issued on June 24, 2022. Count I of the indictment alleged defendant committed aggravated domestic battery (*id.* § 12-3/3.3(a-5)) by grabbing J.L. by the neck, "thereby intentionally impeding the normal breathing or circulation of the blood of J.L. by applying pressure on her neck." Count II alleged defendant committed domestic battery (*id.* § 12-3.2(a)(1)) by striking J.L. and causing her nose to bleed. Count III alleged defendant endangered the life or health of a child (*id.* § 12C-5(a)(2)) by knowingly causing or permitting J.L. to be placed in circumstances that endangered her life, namely, kicking her out of the house at 4 a.m. Count IV alleged defendant committed the offense of resisting a peace officer (*id.* § 31-1(a)) by knowingly resisting Officer Corey Roser in the execution of his official duties as a law enforcement officer, "in that she pulled away" from the officer. The indictment was amended on July 12, 2022, to correct the possible sentences on both domestic battery charges. On December 5, 2023, the case proceeded to a jury trial on all four counts.

¶ 5                              A. The Underlying Domestic Incident

¶ 6          The facts pertinent to an understanding of the case and relevant to this appeal will be discussed.

¶ 7          At 4:06 a.m. on May 29, 2022, J.L. called 911 and informed the dispatcher defendant had been drinking, was "acting crazy," said she hated J.L., and repeatedly said she was going to kill her. J.L., who was crying throughout the call, said defendant kept "pulling me by my hair," was "hitting me in my face," and "choked me." J.L. said there was "blood everywhere" from her nose, defendant "kept punching [her] in the top of [her] head," and her head was "hurting

- 2 -

badly." J.L. said defendant eventually "pushed her outside." J.L. explained the incident started after they arrived home from a family gathering, when she was taking braids out of her hair and defendant took her cell phone. J.L. repeatedly said she had not done anything, and defendant was attacking her for no reason. She repeated that she was scared because her younger brother was in the house with defendant by himself, but she was also too scared to go back in. Continuing to cry, she said she did not want defendant to get in trouble for the incident. J.L. told the dispatcher she just wanted to go be with her father.

¶ 8     Rockford Fire Department paramedic Tanner Behrends testified he was dispatched to the scene and J.L. was taken by ambulance to SwedishAmerican Hospital. While in the ambulance, Behrends observed J.L. had a bloody nose and lip and some small cuts on her face. J.L. told Behrends she had been punched and choked. Jeffrey Conus, a registered nurse at SwedishAmerican Hospital, testified that he treated J.L. and observed "blood around her mouth and nose, some small abrasions on her face, and a hematoma on her forehead." J.L. told Conus defendant had punched her multiple times in the face, choked her, and "knelt" on her back.

¶ 9     At trial, J.L. testified she, defendant, and her brother arrived home at around 3 a.m. on the day of the incident, after spending several days at a family member's house due to a relative's death. Her father (who does not live with them) dropped them off at their home. After her father left, J.L. got into an argument with defendant because J.L. was being loud on her cell phone. Defendant, who J.L. acknowledged had been drinking, took J.L.'s cell phone, and they argued back and forth, taking the cell phone from one another. J.L. testified defendant did not hurt her, and she had no injuries after the incident. However, she acknowledged she told several officers that defendant had hurt her, hitting her more than 10 times that morning. She also admitted to telling the 911 dispatcher she was scared, defendant repeatedly hit her, and defendant had choked

her. J.L. stated defendant did not kick her out, and she left the house on her own. J.L. said she was not scared that night, but she was angry and let her "frustrations" get the best of her. J.L. admitted she told the 911 dispatcher she did not want defendant to get in trouble for the incident, and she still did not want defendant to be in trouble for "something that I said on the phone and lied for." J.L. testified she had a history of nosebleeds due to the "weather and body and stuff, emotions."

¶ 10                              B. Defendant's Interaction With Police

¶ 11          Three officers from the Rockford Police Department who responded to defendant's residence on May 29, 2022, testified, and their body-worn camera footage was entered into evidence.

¶ 12                              1. *Officer Mitchell Parker's Testimony*

¶ 13          Officer Mitchell Parker testified he was dispatched to defendant's residence at 4:06 a.m. on the morning of the incident. Officer Parker met J.L. in the driveway of her residence and observed she was visibly upset, crying, and "had some dry blood on her face and person." After walking J.L. to the ambulance for transport to the hospital, Officer Parker went in the home to speak with defendant. While in the kitchen, defendant told Officer Parker J.L. was being dramatic, and she had only "tapped" J.L. on the nose, which started the bleeding. Officer Parker handcuffed defendant. Officer Parker testified defendant, while handcuffed, began trying to get into a cabinet drawer, which he "assumed was a knife drawer, you know utensil drawer, but we instructed her multiple times to not do that, which she refused to do what we were saying." Defendant was taken out of the house at this time. On cross-examination, Officer Parker stated he believed defendant exhibited signs of intoxication, notably, her speech pattern and slurred words. Officer Parker acknowledged he feared for his safety when defendant opened the cabinet drawer.

¶ 14                    2. *Officer Roser's Testimony*

¶ 15            Officer Roser testified he also met J.L. at the end of the driveway and observed that she was crying, her braids were in disarray, her nose was bleeding "profusely," and "[t]he front of her shirt was covered in blood." Once J.L. was transported to the hospital, he approached the home to speak with defendant. Defendant partially opened the door and stated she was not dressed. Officer Roser testified, "[W]e had asked her to clothe herself before opening the door," and she returned to the door wearing a robe. Officer Roser spoke with defendant in her kitchen and explained what J.L. had reported. Defendant said she did not hit J.L. hard, but "tapped her on the nose, and heavy bleeding from the nose is common in her family."

¶ 16            Officer Roser confirmed the details, shown in the footage from his body-worn camera, of his conversation with defendant, who described J.L. as being disrespectful and telling the officers, "Oh, she's driving me crazy. Y'all can take her if y'all want to. I'm tired of disrespect." Officer Roser testified he briefly took defendant's son to a different room, but he returned to the kitchen when he heard defendant becoming loud and "resistive verbally." When he got back to the kitchen, Officers Parker and Enrique Schaefer were with defendant, who was already handcuffed. At this time, defendant was moving in the kitchen toward a cabinet drawer, and she said something about getting a pen. Officer Roser testified he had safety concerns because there could have been "a knife or other objects, even a pen could be used as a weapon." Defendant was yelling, and she was "angry, verbally resistive, and not following our orders."

¶ 17            Officer Roser testified he instructed defendant to walk out of the house, but "[d]ue to no cooperation, we began to pull her out of the residence." He stated defendant was tensing her muscles and pulling away as they walked her out. Defendant was also "flowing around, making it hard to keep a good grip or control on her as we made our way to the squad car." Officer Schaefer

was assisting him in getting her from the house to the squad car. Officer Roser explained, while pulling away, defendant was "screaming really loud, verbal accusations against officers." When asked whether they did anything to try to keep defendant clothed, given that she was only wearing a robe, Officer Roser testified, "[w]We attempted to keep her clothed. With flowing around and her resistive behavior it was hard to do. So we got her to the squad car as soon as we could." When asked if defendant got into the squad car willingly, Officer Roser stated, "No," and two officers had to sit her down and get her into the car.

¶ 18 On cross-examination, Officer Roser testified it took a couple of minutes to take defendant from the house to the squad car. During this time, he grabbed her wrists and arm to pull her forward and then control "her maneuvers by *** plac[ing] [his] hand on her shoulder and walking her forward." Defendant was on the ground at one point during the walk to the squad car. Officer Roser explained, "[S]he placed herself onto the ground. So by pulling away, flowing around, falling back, she put herself onto the ground, and we had to pick her up and put her into the car." Officer Roser testified defendant's robe was "long enough to cover her sensitive areas." Officer Roser disputed that defendant could have tripped, explaining, "[S]he would have tripped forward, not backwards." He acknowledged defendant was "very concerned about staying covered." Officer Roser testified he could smell alcohol on defendant's breath, and her aggressive behavior could have been an indicator of intoxication.

¶ 19 3. *Officer Schaefer's Testimony*

¶ 20 Officer Schaefer testified he arrived at defendant's residence after she had been arrested, and he observed her being placed in custody. Officer Schaefer assisted Officer Roser in escorting defendant from the house to the squad car by walking behind her. He explained defendant ended up on the ground at one point because she used "her body weight" to "kind of go limp so it

was harder for us to guide her to the squad car." On cross-examination, Officer Schaefer acknowledged it took about two minutes to get defendant from her house to the squad car. Officer Schaefer stated he and Officer Roser applied some force by pushing defendant to keep her moving forward. Officer Schaefer testified defendant exhibited some signs of intoxication, including slurred speech and glossy eyes.

¶ 21                                 4. *Body-Worn Camera Footage*

¶ 22            Footage from Officer Roser's body-worn camera shows defendant and her young son answering her door. Defendant explains she is not clothed, so she leaves for a moment and returns to allow the officers to enter her home. Defendant is wearing a bathrobe and appears to be holding it closed with her hands. Officers Roser and Parker speak with defendant about the incident between her and J.L. Officer Schaefer arrives and stands in the entryway. Officer Roser offers to take defendant's young son to see his squad car and away from the discussion. Defendant does not want him to do that. Officer Roser then follows defendant's son to another room, away from the discussion.

¶ 23            Officer Roser returns to the kitchen, where defendant is handcuffed with her hands behind her back and talking, argumentatively, with Officers Parker and Schaefer. Officer Roser asks Officer Parker to supervise defendant's son, and Officer Parker leaves the kitchen. At this time, defendant's robe, which is not fastened with a tie or belt, is opened, revealing she is only wearing underwear. Defendant turns, facing the kitchen cabinets, attempting to open a cabinet drawer and stating she is trying to get a pen to write down the officers' names. Officer Roser tells defendant, "We are done with the games," and defendant raises her voice. Officer Roser says, "Stop talking," but defendant continues to talk, and Officer Roser then tells defendant they are "about to rip you out of here and put you in a squad car." Defendant states, "That's fine," and "I

will go willingly" and asks the officers to cover her up. Officer Roser pulls defendant's robe closed and tells her to stop reaching in the drawers because they do not know what was in them. Defendant says she would like to call her mother, but the officers tell her they need to take care of this situation first. Defendant protests and says, "No, can I please call my mom."

¶ 24        At this time, Officer Roser begins to lead defendant out of the house and defendant can be heard saying, "Why, why, why, why." As she is being led to the squad car, defendant complains about the officers and yells, "Hello, hello, can anyone hear me—they're violating my rights," "He's trying to drag me to the ground—he's dragging me," "I'm getting violated," "Hello—neighbors, can y'all hear me—I'm getting violated." Defendant then says, "and then you're pushing me on the fucking ground." Defendant says to Officer Roser, "Why are you pushing me like that" while they are next to the squad car. Defendant refuses to get into the car. Defendant asks Officer Roser to state his name, he does so, and defendant is put into the squad car.

¶ 25        Footage from Officer Schaefer's body-worn camera shows the discussion in the kitchen. Officer Schafer assists while Officer Parker handcuffs defendant. Defendant repeatedly asks why she is being handcuffed and expresses concern that she is not wearing anything under her robe. Both officers ask if she wants them to get her some different clothes. In response, defendant repeatedly states she is exposed, and the officers ask again if they can get her some clothing or her coat. Defendant says she will get clothing herself if they release her and then they could handcuff her again. The officers explain they were "past that," but they could get a female officer to come if she wished. Defendant states, "That's fine," and "You got me still handcuffed with my body showing." Defendant then begins asking the officers repeatedly to give her their names and tells the officers not to touch her. Defendant says, "Now, you gonna act like I'm

resisting arrest because I'm trying to get a pen." Officer Schaefer's vantage point shows Officer Roser returning to the kitchen and defendant turning away from Officer Roser in an attempt to access a cabinet drawer to "get a pen." Officer Roser holds defendant by the arm and moves to lead her out of the house. When they get to the door and defendant says, "Why, why, why, why," she stops their movement forward, so Officer Roser (holding both sides of her robe together in front of her to cover her) pulls her out the door by her robe while Officer Schaefer takes her arm to guide her from behind. As defendant is being led to the car, she stops walking, turns to the left, pulls away from Officer Roser (toward neighboring houses), and maneuvers her body to avoid walking forward as she is yelling, "Hello, hello, can anyone hear me—they're violating my rights." As the officers try to get defendant moving again, she bends forward and pulls to the left again to stop moving forward, and then she falls to the ground. Officer Roser (with the assistance of Officer Schaefer) pulls defendant back to her feet, and they continue walking. Officer Schaefer moves forward to open the squad car door. After defendant, who continues to yell, is led to the squad car and seated with her feet still on the ground, she stands up, takes a step away from the squad car, and yells, "Hello," again. Officer Roser tells defendant to get into the car and puts her feet in the car, and she says, "No." Officers Roser and Schaefer put defendant in the car and close the door.

¶ 26                              B. Defendant's Case

¶ 27         At the close of the State's case, defendant moved for a directed verdict on the charges of endangering the life or health of a child (count III) and resisting a peace officer (count IV). The trial court granted defendant's motion for a directed verdict as to count III but denied the motion as to count IV.

¶ 28         The defense called Kristina Steele, a child protection specialist from the Illinois Department of Children and Family Services, to testify for the limited purpose of presenting

evidence of a prior consistent statement made by J.L. Steele spoke with J.L. in June 2022 about the incident that occurred on May 29, 2022. Steele testified that J.L. told her "[she] and her mother were in a tussling match over a phone and her nose started bleeding because it bleeds randomly." J.L. told Steele defendant did not punch her, but she acknowledged she told the police defendant had done so because she was mad. J.L. told Steele defendant had not injured her on the day of the incident.

¶ 29 J.L.'s medical records as they relate to her problem with nosebleeds were also admitted into evidence, showing in April 2018, J.L. sought treatment for nosebleeds and was referred to a specialist for possible cauterization to address the condition.

¶ 30 C. Jury Instruction on Resisting a Peace Officer

¶ 31 At the jury instruction conference, the State and defense presented their own proposed instructions on the law regarding resisting a peace officer. The State proposed an instruction based on Illinois Pattern Jury Instructions, Criminal, No. 22.14 (approved May 4, 2018) (hereinafter IPI Criminal No. 22.14), as follows:

"To sustain the charge of Resisting a Peace Officer, the State must prove the following propositions:

*First Proposition:* That Corey Roser was a peace officer; and

*Second Proposition*: That the defendant knew Corey Roser was a peace officer; and

*Third Proposition*: That the defendant knowingly resisted the performance by Corey Roser of an authorized act within his official capacity.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find

the defendant guilty.

> If you find from your consideration of all the evidence that any one of those propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty."

¶ 32   The defense objected to this instruction. Citing *People v. Gotschall*, 2022 IL App (4th) 210256, and *People v. Sadder-Bey*, 2023 IL App (1st) 190027, the defense argued the State is required to prove defendant's conduct was a "material impediment" to sustain a resisting a peace officer charge. Therefore, the defense proposed a non-IPI instruction on the law regarding resisting a peace officer. The proposed instruction contained all of the language of IPI Criminal No. 22.14, with an additional fourth proposition, as follows:

> "*Fourth Proposition:* That the Defendant's conduct materially impeded an authorized act of a peace officer."

¶ 33   The trial court stated it would only give a non-IPI jury instruction if the IPI jury instruction "no longer accurately instructs as to the state of the law." The court ruled IPI Criminal No. 22.14 accurately stated the law regarding resisting a peace officer; therefore, the State's instruction was submitted to the jury.

¶ 34                    D. The Jury's Verdict and Sentence

¶ 35   Defendant was found guilty of resisting a peace officer (720 ILCS 5/31-1(a) (West 2022)) and domestic battery (*id.* § 12-3.2(a)(1)). Defendant was found not guilty of aggravated domestic battery (*id.* § 12-3/3.3(a-5)). She was sentenced to 180 days in jail, with credit for 3 days served (and the remaining 177 days stayed), and 24 months' conditional discharge. Defendant's motion for a new trial was denied.

¶ 36   This appeal followed.

¶ 37                                    II. ANALYSIS

¶ 38        Defendant argues the State failed to prove her guilty beyond a reasonable doubt of resisting a peace officer by failing to prove she materially impeded Officer Roser's efforts to arrest her. Alternatively, defendant contends her conviction should be vacated and the case remanded for a new trial because the jury should have been instructed that the State was required to prove beyond a reasonable doubt that her conduct materially impeded the officer's execution of his official duties. We affirm.

¶ 39                          A. Sufficiency of the Evidence

¶ 40        Defendant's first issue on appeal is whether the State proved beyond a reasonable doubt she resisted arrest by failing to prove she materially impeded Officer Roser's performance of an authorized act within his official capacity as a police officer. "Where a criminal conviction is challenged based on insufficient evidence, a reviewing court, considering all of the evidence in the light most favorable to the prosecution, must determine whether any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime." *People v. Brown*, 2013 IL 114196, ¶ 48. "This standard of review 'gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' " *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). A reviewing court will not substitute its judgment for that of the trier of fact and will not reverse the trial court's judgment unless the evidence is so "unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *People v. Sauls*, 2022 IL 127732, ¶ 52.

¶ 41        At the time defendant was charged in this case, section 31-1(a)(2) of the Criminal Code of 2012 (Criminal Code) provided as follows: "A person who knowingly *** resists or

obstructs the performance by one known to the person to be a peace officer, firefighter, or correctional institution employee of any authorized act within his or her official capacity commits a Class A misdemeanor." 720 ILCS 5/31-1(a)(2) (West 2022). In *Gotschall*, 2022 IL App (4th) 210256, ¶¶ 26-27, this court determined the crime of obstructing a peace officer includes a "material impediment requirement," wherein the defendant's conduct must materially impede or hinder the officer in the performance of his or her authorized duties. Accord *People v. Mehta*, 2020 IL App (3d) 180020, ¶ 23. The First District extended the material impediment requirement to the crime of resisting a peace officer, finding "[a]cts that obstruct might be different from those that resist, but the line by which they become criminal is drawn in the same place. While they are two separate prohibitions, the crime of obstructing or resisting a peace officer 'addresses related types of interference.' " *Sadder-Bey*, 2023 IL App (1st) 190027, ¶ 39. Therefore, "to be guilty of resisting a peace officer as section 31-1 contemplates it, the defendant must physically exert himself in a manner that actually interferes with the administration of justice—that is, he must act in a way that materially opposes an officer's attempt to perform an authorized act." (Emphasis omitted.) *Id.* ¶ 40.

¶ 42    To prove defendant resisted arrest, the State must show she committed "a physical act that impedes, hinders, interrupts, prevents or delays the performance of the officer's duties" such as "going limp, forcefully resisting arrest, or physically helping another party to avoid arrest." *People v. McCoy*, 378 Ill. App. 3d 954, 962 (2008) (citing *People v. Raby*, 40 Ill. 2d 392, 399 (1968)). "The acts of struggling or wrestling with a police officer are physical acts of resistance that will support a conviction for resisting a peace officer, even if the underlying attempted arrest is unwarranted." *Id.* (citing *People v. Miller*, 199 Ill. App. 3d 603, 611 (1990)). "Passive acts, or failing to act when ordered to, can be acts of 'resistance,' but they often will need to be combined

with some other act of opposition or counteraction to reach a level of materiality that is criminal." *Sadder-Bey*, 2023 IL App (1st) 190027, ¶ 42. This may include such actions as going limp or "indicating an intent to counteract an officer's order or force." *Id.*

¶ 43    Defendant argues her conduct did not "materially hinder[ ] Officer Roser's ability to place her in custody" and any delay caused by her conduct was "minimal" and, thus, not criminal. She argues nothing about her conduct posed a threat or safety risk to Officer Roser; rather, it amounted to "brief and ineffectual acts of token resistance which served to only slightly delay [Officer] Roser's efforts." We disagree.

¶ 44    Defendant's interaction with Officer Roser shows she materially interfered with his lawful acts during the entire encounter. While in her kitchen, defendant, clearly agitated, turned away from the officers and defied Officer Roser's order to stop trying to access the cabinet drawers. Defendant claimed she was attempting to get a pen to write down the officer's names, though her hands were handcuffed behind her back. At that time, Officer Roser verbalized his concern that they did not know what was inside the drawers. At trial, Officers Roser and Parker testified they had safety concerns because of defendant's conduct and explained there could have been "a knife or other objects, even a pen could be used as a weapon." This is when Officer Roser made the decision to remove defendant from the kitchen, away from the very real safety concern resulting from defendant's conduct, and he began taking her to the squad car.

¶ 45    Footage from the body-worn cameras shows defendant engaging in conduct that she acknowledges was an impediment to Officer Roser as they were moving to the squad car. As Officer Roser led defendant toward the door to exit her residence, defendant abruptly stopped their movement forward as she states, "Why, why, why, why." At trial, Officer Roser testified defendant was "tensing her muscles and pulling away." He was forced to pull defendant out the door, holding

both sides of her robe to keep her covered, while Officer Schaefer took defendant's arm to guide her from behind.

¶ 46 On the brief walk to the squad car, defendant again stopped walking, turned, and maneuvered her body to avoid walking forward as she yelled in the direction of neighboring homes, "Hello, hello, can anyone hear me—they're violating my rights." Officer Roser testified defendant was "flowing around, making it hard to keep a good grip or control on her as we made our way to the squad car." As the officers tried to get her moving again, defendant, who continued yelling toward the neighboring houses, bent forward and to the left, away from Officer Roser and, thus, changed their trajectory. As a result of this struggle, she fell to the ground. Officer Schaefer testified defendant ended up on the ground because she "use[d] her body weight" to "kind of go limp so it was harder for us to guide her." The officers assisted defendant to her feet and proceeded toward the squad car.

¶ 47 Defendant engaged in further conduct to hinder Officer Roser's efforts upon reaching the squad car. Defendant, seated in the squad car with her feet still on the ground, defiantly stood up, stepped away from the squad car, and continued to yell. Officer Roser told defendant to get in the car and put her feet inside. Defendant did not comply, responding with a resounding, "No." The efforts of two officers were required to finally put defendant in the car.

¶ 48 After our review, we find defendant's characterization of her conduct with Officer Roser as brief "token resistance" unsupported by the evidence. The defendant repeatedly hindered Officer Roser in performing his official duties. She turned away from the officers and made multiple attempts to access cabinet drawers, despite repeated orders to stop doing so because it posed a safety risk. While being escorted to the squad car, defendant stopped and pulled away

from Officer Roser on multiple occasions, one of which resulted in her falling to the ground. She also refused to get in the squad car.

¶ 49    Citing *Mehta*, defendant argues the limited duration of her hinderance is evidence that her conduct was not criminal, as it was "no more than minimal resistance that briefly delayed the officers' efforts." In *Mehta*, the court explained, "While an act might hinder or impede an official act in the technical sense, that hinderance or impediment may be so minimal as to not be considered a violation of the statute in question." *Mehta*, 2020 IL App (3d) 180020, ¶ 21. However, the court also noted, "Aside from the length of the delay, one relevant factor in this determination is the nature of the obstructive act itself," and "[t]he nature of the 'authorized act' being obstructed is also relevant." *Id.* ¶ 34. The brevity of the interaction is but one factor the court must consider when determining whether conduct materially impedes a peace officer. *People v. Osman*, 2024 IL App (2d) 230149-U, ¶ 40. In this case, the cumulative effect of defendant's repeated acts of defiance materially impeded and hindered Officer Roser's efforts to perform his official duties and, at one point, created a safety risk for the officers. See *Gotschall*, 2022 IL App (4th) 210256, ¶ 30 ("[A] defendant's conduct may be found to materially impede an authorized act of a peace officer, even if it causes only a brief delay, if it threatens officer safety."). Considering all the evidence in the light most favorable to the prosecution, a rational trier of fact could have found defendant guilty of resisting a peace officer beyond a reasonable doubt.

¶ 50                              B. Jury Instructions

¶ 51    Defendant contends her conviction should be vacated and a new trial ordered because the jury should have been instructed that the State had to prove beyond a reasonable doubt that her conduct materially impeded Officer Roser. Defendant argues "materiality" is an element

of the offense of resisting a peace officer; thus, not allowing her non-IPI instruction adding this element resulted in the jury being misinformed of the law. We disagree.

¶ 52 A defendant's right to a fair trial includes providing proper instructions to the jury. See *People v. Green*, 225 Ill. 2d 612, 622 (2007). "The purpose of jury instructions is to provide the jury with the correct legal principles applicable to the evidence, so that the jury may reach a correct conclusion according to the law and the evidence." *People v. Bannister*, 232 Ill. 2d 52, 81 (2008). "The defendant, like the State, is entitled to the submission of appropriate jury instructions on the law that applies to the defendant's theory of the case if there was evidence in the record to support that theory." *People v. Gilliam*, 172 Ill. 2d 484, 519 (1996). Illinois Supreme Court Rule 451(a) (eff. Apr. 8, 2013), provides:

> "Whenever Illinois Pattern Jury Instructions, Criminal, contains an instruction applicable in a criminal case, giving due consideration to the facts and the governing law, and the court determines that the jury should be instructed on the subject, the IPI Criminal instruction shall be used, unless the court determines that it does not accurately state the law."

¶ 53 The decision on whether to give a non-IPI jury instruction rests within the sound discretion of the trial court. *People v. Tompkins*, 2023 IL 127805, ¶ 42. "An abuse of discretion in the refusal of a non-IPI instruction occurs only where there is no IPI instruction that applies to the subject on which the jury should have been instructed." *Gilliam*, 172 Ill. 2d at 519. "Conversely, a trial court does not abuse its discretion by refusing to give a non-IPI instruction if there is an applicable IPI instruction or the essence of the refused instruction is covered by other given instructions." *Id.* However, "when the issue is whether the applicable law was correctly conveyed by the instructions to the jury, the appropriate standard of review on appeal is *de novo*." *People v*

*Max*, 2012 IL App (3d) 110385, ¶ 52.

¶ 54　　　　The elements of the offense of resisting a peace officer as set forth in section 31-1(a) of the Criminal Code (720 ILCS 5/31-1(a) (West 2022)) are reflected in IPI Criminal No. 22.14, which was given to the jury. Defendant's argument that this instruction does not accurately reflect the law without a modification to include the materiality requirement was considered in *People v. McAndrew*, 2024 IL App (1st) 230881, ¶ 43. The court relied on the holding in *Osman* as persuasive authority, explaining:

> "The appellate court rejected defendant's argument, finding that [IPI Criminal No. 22.14] accurately conveys the applicable law and that, where the evidence and arguments at trial detail defendant's obstructive conduct, making the jury aware of what conduct was alleged to support the obstruction charge, no modification to [IPI Criminal No. 22.12] are necessary." *McAndrew*, 2024 IL App (2d) 230881, ¶ 43 (citing *Osman*, 2024 IL App (2d) 230149-U, ¶ 28).

¶ 55　　　　In this case, the charged offense was consistent with the jury instruction given. There were no unusual facts or new laws to be considered to necessitate adding a separate instruction regarding the "material impediment" requirement. The evidence and arguments at trial made the jury aware that it was being asked to decide if defendant's conduct of repeatedly pulling away from Officer Roser during his efforts to remove her from her residence and put her in the squad car obstructed him in the performance of his authorized duties. As such, no modifications were necessary, as the jury was properly instructed.

¶ 56　　　　　　　　　　　　　　III. CONCLUSION

¶ 57　　　　For the reasons stated, we affirm the trial court's judgment.

¶ 58　　　　Affirmed.