2025 IL App (2d) 240310-U
No. 2-24-0310
Order filed July 30, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 22-CM-891 |
| RASHAD D. COLE, | ) ) | Honorable Rene Cruz, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE BIRKETT delivered the judgment of the court.
Justices Schostok and Mullen concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant was proven guilty of obstructing a peace officer where (1) the officer was performing, in a residential driveway, a traffic stop of a vehicle that had just arrived at the house after committing a traffic violation in the officer's presence a short time before; (2) defendant, the vehicle's driver, knew that the officer was performing a traffic stop, given that the officer pulled into the driveway with his overhead lights activated and directed defendant (not any of the passengers) to come speak with him; and (3) defendant materially impeded the officer's performance of the traffic stop by ignoring the officer and walking into the residence.

¶ 2    Defendant, Rashad D. Cole, appeals from his conviction, following a jury trial, of obstructing a peace officer (720 ILCS 5/31-1(a)(2) (West 2022)), contending that the State failed

to prove him guilty beyond a reasonable doubt. According to defendant, the State failed to prove that (1) the officer was performing an authorized act, (2) defendant had knowledge of the authorized act, and (3) defendant's actions materially impeded the officer's performance of the authorized act. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        On July 12, 2022, defendant was charged with obstructing a peace officer (*id.* § 31-1(a)(2)), driving on a revoked license (625 ILCS 5/6-303(a) (West 2022)), and squealing or screeching tires (*id.* § 11-505). The charges stemmed from an incident that occurred in the early morning hours of July 7, 2022.

¶ 5        A jury trial took place on February 27, 2024. The State produced one witness—Elgin police officer J. Taylor.[1] Taylor testified that, on July 7, 2022, at about 12:15 a.m., he was in his police uniform and on patrol in his marked squad car. His squad car was "stationary" east of Dundee Avenue, facing west. From where he was positioned, Taylor could see a Speedway gas station located across Dundee Avenue. Taylor heard "the audible screeching of tires from [a] vehicle that was exiting the gas station parking lot." He observed the vehicle "accelerate quickly and recklessly as [he] heard the screeching." Taylor testified that squealing tires was a violation of the traffic code (see *id.*). Taylor described the vehicle as a blue four-door Dodge Charger sedan. Taylor was about 200 feet from the vehicle, and the area was well-lit. When Taylor turned his squad car around to effectuate a traffic stop, the vehicle "eluded" him by going through a parking lot. Taylor did not see the vehicle's direction of travel. However, Taylor was able to obtain its license plate number as it drove past.

_____

[1]Officer Taylor's first name is not contained in the record.

¶ 6    Taylor looked up the vehicle registration and learned that the vehicle was registered to Blake McDaniel at an Elgin address (McDaniel's residence).  Taylor drove to McDaniel's residence.  When Taylor arrived, he "observed the [vehicle] reversing from [the street] into the driveway" of McDaniel's residence.  Taylor could not see who was driving the vehicle.  He testified: "I had to approach and effect a traffic stop by activating my overhead lights, at which point I observed a male get out of the driver's seat of the vehicle."  Taylor testified that he activated his overhead lights after he saw the vehicle back in.  Taylor identified defendant as the individual he observed exit the driver's seat.  After defendant exited the vehicle, he "began walking inside the attached garage [of McDaniel's] residence."  Taylor was about five feet from defendant and could see his face clearly.  Taylor vocally identified "a piece of clothing [defendant] was wearing" and advised him "to stop."  Defendant replied, " 'I am.' "  Defendant then instructed McDaniel— who had been one of the passengers in the vehicle—to unlock the door to the residence.  Taylor followed defendant halfway into the garage but then left because he feared for his safety.

¶ 7    According to Taylor, defendant "impede[d] [his] duty to investigate and conduct a traffic stop" by not "identify[ing] himself as the driver, [or] *** allow[ing] [Taylor] to detain him and ask him questions."  Taylor explained that he was unable to obtain defendant's name and date of birth so that he could complete the traffic citation at that time.  Taylor left McDaniel's residence "for a short period" and returned with backup officers.  Upon his return, Taylor spoke with McDaniel and "asked for the driver to exit the residence and to come speak to [him] about the incident."  Defendant did not comply.

¶ 8    Taylor testified that he obtained still images of defendant from his body camera and sent "an attempt[-]to[-]identify email to the Elgin Police Department."  He was directed to defendant's "in-house booking images" and was able to identify defendant as the driver.  Taylor identified

People's exhibit No. 3 as the "booking image of [defendant] from 2020," which he used to identify defendant. After identifying defendant as the driver, Taylor obtained a warrant for defendant's arrest.

¶ 9    Taylor testified that his squad car was equipped with a dashboard camera. He identified People's exhibit No. 1 as the video recording taken by the squad car camera on the evening of the incident. The video was played for the jury. The video showed the squad car en route to McDaniel's residence. At about the 30-second mark, Taylor traveled through an intersection, making a left turn through a red stoplight. Based on the reflection off the street signs, the squad car's overhead emergency lights appeared to be activated. Taylor continued down a four-lane road (with two lanes in each direction). At an intersection, Taylor turned right from the main road onto a side street. McDaniel's residence—a corner house—was located on the right side of the main road and the left side of the side street onto which Taylor turned. The house's driveway was immediately accessible from the side street.

¶ 10    At the 37-second mark of the video, as Taylor approached the intersection on the main road, the front headlights of the vehicle in McDaniel's driveway first came into view. The vehicle was backed (or backing) into the driveway with its front headlights on. As the squad car approached McDaniel's residence, the vehicle's headlights were in and out of view due to the presence of various trees and light posts on the right side of the main road, which intermittently blocked the camera's view of the vehicle. The view became unobstructed as the squad car approached the scene. The vehicle's rear brake lights shone brightly and reflected off the closed garage door. The vehicle's front headlights were on. No one was standing on the driveway, and the car doors were closed.

¶ 11    At the 44-second mark, Taylor turned right onto the side street. At this point, no individuals were visible outside of the vehicle. The vehicle was momentarily out of view as Taylor turned right and then immediately left, pulling the squad car partially into the driveway. From this position, only the driver's side of the vehicle was visible. At the 47-second mark, the squad car stopped, and an individual in a red shirt (later identified as defendant) exited the front driver's side of the vehicle and walked to the rear and behind the vehicle. The garage door was closed. A second individual exited the rear driver's side of the vehicle. A third individual walked around from the rear of the vehicle to retrieve something from the front driver's side of the vehicle.

¶ 12    Taylor testified as to what could be seen from the 45- through 48-second marks of the video as his squad car approached the residence. He stated: "The front headlight that is partially visible is the headlight to the [vehicle] that I had just observed reverse off the roadway into the driveway. And then the male in the red is the—was the driver of the vehicle." Taylor testified that the vehicle was still running.

¶ 13    Taylor identified People's exhibit No. 2 as the video recording taken from his body-worn camera. It was played for the jury and depicted the following. As Taylor exited his squad car after pulling it partially into the driveway, the parked vehicle was visible with three men standing around it. The garage door of the residence was closed. Taylor approached the front of the vehicle and walked to the right. The three men were still in view. Taylor said, "Hey, red shirt, come talk to me." The men, including defendant, walked toward the closed garage door as Taylor repeated, "Hey, come talk to me." Defendant said, "I am." As the garage door began to rise, Taylor repeated, "Come talk to me. Don't go inside." As defendant and one of the men walked into the garage, the man (presumably McDaniel) repeatedly told Taylor that Taylor "can't go on [his] property." Taylor followed defendant into the garage, repeatedly telling defendant to "come out and talk to

[him] now." Defendant refused and directed McDaniel to open the interior door of the garage leading into the house. Taylor exited the garage as the third man entered the garage. Taylor advised defendant that he would be getting a warrant for defendant's arrest.

¶ 14 On cross-examination, Taylor testified that, before the incident, he was familiar with McDaniel and the vehicle. He did not know defendant. Taylor did not activate his lights or attempt to stop the vehicle when it first drove past him. About five to ten minutes had passed between the time he heard the squealing tires and his arrival at McDaniel's residence. He did not have to stop his squad car to enter the vehicle registration; he was able to do so while driving. His dashboard camera activated when his overhead lights were activated; it was not recording when he was on patrol. Taylor testified that, although he saw the vehicle back into the driveway, that action could not be seen on the recording because the camera "only records what is in front of [his] car and what is not off to the side." Taylor saw three people exit the vehicle. He was not given any of the individuals' names. Taylor did not see the driver operating the vehicle when it was moving, and he could not make out anyone's face because "[t]he vehicle has dark windows." The vehicle was parked when Taylor arrived at McDaniel's residence. After Taylor returned to the residence with backup officers, they remained on the scene for about 10 to 15 minutes. They left because "[they] were not getting anywhere and *** it was not beneficial to us nor them." Taylor left without knowing defendant's name. Taylor learned defendant's name the next evening—approximately 20 hours after leaving the scene.

¶ 15 On redirect examination, Taylor explained why he did not immediately attempt to conduct a traffic stop upon observing the vehicle squeal its tires. He stated:

"I, *** as a habit, do not activate my emergency lights just at the abrupt sight of a traffic violation due to the hazards that it might cause for myself if I pull into an intersection

or other motorists if I were to try to cut them off to use my—to use my lights to stop somebody.

So out of safety of not only myself but the motoring public and the possible person that I'm stopping, I get myself into a safe, strategic position to make a traffic stop."

Taylor reiterated that, as he approached McDaniel's residence, he saw the vehicle back into the driveway and then park. He also saw the driver exit the vehicle.

¶ 16 On recross examination, defense counsel replayed the squad car video. Taylor agreed that the video did not "depict a car backing in."

¶ 17 In addition to People's exhibit Nos. 1, 2, and 3, the trial court admitted into evidence People's exhibit No. 4—defendant's certified driving abstract. The driving abstract indicated: "REVOCATION WAS IN EFFECT ON 07-07-2022[.]"

¶ 18 After the State rested, defendant moved for a directed verdict. Defendant argued that the State failed to present any evidence that defendant was driving at the time of the incident or that defendant was the individual who walked away from Taylor. The trial court denied the motion.

¶ 19 Defendant rested without presenting evidence.

¶ 20 With the agreement of the parties, the trial court gave the jury the following two instructions on the offense of obstructing a peace officer:

"A person commits the offense of obstructing a peace officer when he knowingly obstructs the performance of any authorized act within the official capacity of one known to him to be a peace officer."

"To sustain the charge of obstructing a peace officer, the State must prove the following propositions:

*First Proposition*: That Officer Taylor was a peace officer; and

*Second Proposition*: That the defendant knew Officer Taylor was a peace officer; and

*Third Proposition*: That the defendant knowingly obstructed the performance by Officer Taylor of an authorized act within his official capacity.

If you find from your consideration of all the evidence that these propositions have been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions have not been proved beyond a reasonable doubt, you should find the defendant not guilty."

¶ 21 In closing arguments, as to the third proposition, the State argued that Taylor was authorized to conduct a traffic stop of the vehicle after he witnessed the squealing tires. The State argued further that defendant obstructed that act by walking away and not identifying himself. Defense counsel argued that this was a case of mistaken identity. He claimed that Taylor never had a good look at the driver or the individual in the red shirt.

¶ 22 The jury found defendant guilty of obstructing a peace officer (720 ILCS 5/31-1(a)(2) (West 2022)), not guilty of driving on a revoked license (625 ILCS 5/6-303(a) (West 2022)), and not guilty of squealing or screeching tires (*id.* § 11-505).

¶ 23 Defendant filed a motion for judgment notwithstanding the verdict or a new trial. The trial court denied the motion.

¶ 24 Following a sentencing hearing, the trial court sentenced defendant to 2 days in jail and 12 months of conditional discharge. Subsequently, the court amended the sentence from 2 days in jail to 100 hours of community service.

¶ 25 This timely appeal followed.

¶ 26                                   II. ANALYSIS

¶ 27     Defendant contends that the State failed to prove him guilty beyond a reasonable doubt of obstructing a peace officer (720 ILCS 5/31-1(a)(2) (West 2022)).  Defendant argues that the State failed to prove that (1) Taylor was performing an authorized act, (2) defendant knew that Taylor was performing an authorized act, and (3) defendant's actions materially impeded Taylor's performance of an authorized act.

¶ 28     In reviewing a challenge to the sufficiency of the evidence, the relevant question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.)  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  "A guilty verdict may be supported by not only the evidence itself, but also any reasonable inference that may be drawn from the evidence."  *People v. Hsiu Yan Chai*, 2014 IL App (2d) 121234, ¶ 33.  It is not this court's role to retry the defendant.  *People v. Gray*, 2017 IL 120958, ¶ 35.  Rather, it is the responsibility of the trier of fact, the jury here, to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts.  *Id.*  Therefore, we will not substitute our judgment for that of the jury on issues involving the weight of the evidence or the credibility of the witnesses. *Id.*  A defendant's conviction will not be overturned unless the evidence is so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of the defendant's guilt.  *Id.*

¶ 29     Obstructing a peace officer is defined under section 31-1(a)(2) of the Criminal Code of 2012 (Criminal Code) (720 ILCS 5/31-1(a)(2) (West 2022)) as "knowingly *** obstruct[ing] the performance by one known to the person to be a peace officer *** of any authorized act within his or her official capacity."  Thus, to sustain defendant's conviction, the State was required to prove that "(1) defendant knowingly obstructed a peace officer; (2) the officer was performing an

authorized act in his official capacity; and (3) defendant knew he was a peace officer." See *People v. Baskerville*, 2012 IL 111056, ¶ 32; 720 ILCS 5/31-1(a) (West 2022). "It is well settled that the statute does not 'proscribe mere argument with a policeman about the validity of an arrest or other police action' but instead contemplates conduct 'which imposes an obstacle which may impede, hinder, interrupt, prevent or delay the performance of the officer's duties.' " *People v. Coates*, 2025 IL App (4th) 231312, ¶ 30 (quoting *People v. Raby*, 40 Ill. 2d 392, 399 (1968)). "Such an impediment or hindrance must be material and beyond merely technical or *de minimis*." *Id.*

¶ 30                                    A. Authorized Act

¶ 31    We first consider defendant's contention that the State failed to prove that Taylor was engaged in an authorized act. As noted, the statute requires that the officer be engaged in an "authorized act within his or her official capacity." 720 ILCS 5/31-1(a) (West 2022); see *People v. Jones*, 2015 IL App (2d) 130387, ¶ 11. "Generally, 'authorized act' means simply an act of a type that an officer is authorized to perform." *Jones*, 2015 IL App (2d) 130387, ¶ 11. Here, defendant was charged with obstruction "in that he walked away from a lawful traffic stop while being provided a lawful order to return to the area of the traffic stop."

¶ 32    "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." (Internal quotation marks omitted.) *People v. Hackett*, 2012 IL 111781, ¶ 20. With certain exceptions not applicable here, squealing or screeching tires is a violation of section 11-505 of the Illinois Vehicle Code (Vehicle Code) (625 ILCS 5/11-505 (West 2022) ("No person shall operate any motor vehicle in such a manner as to cause or allow to be emitted squealing, screeching or other such noise from the vehicle's tires due to rapid acceleration or excessive speed around corners or other such reason."). The "mission" of a traffic stop is " 'to address the traffic violation that warranted the stop' and to

'attend to related safety concerns.' " *People v. Cummings*, 2016 IL 115769, ¶ 7 (quoting *Rodriquez v. United States*, 575 U.S. 348, 354 (2015)). "The mission's safety concerns permit officers to make ' "ordinary inquiries incident to [the traffic] stop." ' " *Id.* (quoting *Rodriguez*, 575 U.S. at 355, quoting *Illinois v. Caballes*, 543 U.S. 405, 408 (2005)). " 'Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance.' " *Id.* (quoting *Rodriguez*, 575 U.S. at 355).

¶ 33    Defendant does not dispute that, if Taylor observed the vehicle squealing or screeching its tires, he had probable cause to effectuate a traffic stop of the vehicle. Instead, defendant argues that no traffic stop occurred because, according to defendant, "at the time [Taylor] turned on his lights[,] the [vehicle] *** was parked and in the middle of the driveway." He argues that Taylor did not pull into the driveway and approach the men until after "[t]he car had been parked, the occupants of the vehicle had exited, and they were proceeding inside of the home." Thus, according to defendant, no seizure was ever initiated and "telling [defendant] not to go inside had no legal effect." We disagree. The facts are not as cut and dried as defendant suggests.

¶ 34    Taylor testified that he arrived at McDaniel's residence within five to ten minutes of observing a traffic violation. Contrary to defendant's claim that the vehicle had already been parked when Taylor activated his overhead lights, the squad car video showed that the squad car's overhead lights had been activated while Taylor was en route to McDaniel's residence. In addition, although the vehicle's movement is not apparent on the squad car video (and Taylor agreed on cross-examination that the vehicle's movement is not depicted on the video), a jury could have reasonably inferred that the vehicle had been backing into the driveway as Taylor approached. The squad car video showed the vehicle's headlights come in and out of view due to various trees

and light posts on the right side of the main road that intermittently blocked the camera's view of the vehicle. However, as the squad car got closer, and nothing was blocking the camera's view of the vehicle, not only were the vehicle's headlights on, but also the rear brake lights were shining brightly and reflecting off the closed garage door. No one is visible outside of the vehicle. The video thus indicates, contrary to defendant's position, that the car was *not* parked with its occupants already exited; instead, the vehicle was still running and the driver was actively applying the brakes. Then, as Taylor turned the corner and immediately pulled into the front part of the driveway, the rear brake lights turned off, and defendant exited the front driver's side door. Defendant claims that Taylor's act of "turning on his hazard lights and pulling up to the end of the driveway did not indicate a seizure; they were not on the road at the time." However, defendant cites no authority for the proposition that a defendant's action of parking and exiting his vehicle, as a squad car visibly approaches with its overhead lights activated, terminates an officer's authority to conduct an otherwise valid traffic stop. A jury could have rationally concluded that Taylor was acting within his authority to effectuate a traffic stop on a vehicle that he had witnessed commit a traffic violation shortly before.

¶ 35    Defendant also argues that he was not required to respond to Taylor's directive to come talk to him, because when Taylor arrived, "[defendant] was already going inside and was freely moving around." According to defendant, under these circumstances, "[Taylor] had no legal authority to command [defendant] to leave a private residence without a warrant." In support, he relies on *People v. Cope*, 299 Ill. App. 3d 184 (1998). However, *Cope* is readily distinguishable.

¶ 36    In *Cope*, the defendant was charged with obstructing a peace officer based on her failure to open the door of her business in response to police demands during an investigation concerning a missing juvenile who was inside. *Id.* at 189. We held that, because the police did not have a

warrant (and there was no justification for a warrantless entry), the defendant's refusal to open the door did not constitute obstruction of an authorized act. *Id.* at 189-91. We further noted that the defendant's act of locking the door to her business could not be considered obstruction, because the doors were already locked when the police were called to investigate. *Id.* at 189. We stated: "The physical act [of obstruction] has to be in response to an authorized act of the police." *Id.* at 189-90.

¶ 37 Defendant argues that the present case is similar to *Cope* because "[defendant] was already moving inside the house prior to Taylor appearing on the driveway," which "would have happened whether Taylor appeared or not." However, defendant was not already *in* the garage or the house when Taylor arrived. Before defendant exited the vehicle in the driveway, the squad car with its overhead lights activated was well within defendant's sight. Defendant did not exit the vehicle until after Taylor turned onto the side street and into the driveway. We note, too, that the garage door was still closed when Taylor first issued the command to "come talk to [him]." Thus, unlike in *Cope*, Taylor was not unlawfully commanding defendant to leave a private residence without a warrant.

¶ 38 Accordingly, when viewed in the light most favorable to the State, the evidence was sufficient to support the conclusion that Taylor was engaged in an authorized act when he directed Taylor to come talk to him.

¶ 39                                    B. Defendant's Knowledge

¶ 40 Defendant next argues that, even if Taylor was engaged in an authorized act, defendant did not knowingly obstruct that act. Defendant claims that Taylor did not tell him that he was subject to a traffic stop, that he was under arrest, or that there was any ongoing investigation.

¶ 41    "Obstruction of a peace officer under section 31-1 [of the Criminal Code] 'requires that the obstruction must be knowingly done; meaning that the defendant must be consciously aware that his conduct is practically certain to cause the result.' " *People v. Mehta*, 2020 IL App (3d) 180020, ¶ 38 (quoting *Baskerville*, 2012 IL 111056, ¶ 23 n.1).  "[K]nowledge must often be proven through circumstantial evidence." *Id.* ¶ 40.

¶ 42    Defendant argues that, because Taylor requested only that defendant "come talk to [him]," Taylor was initiating a consensual police encounter from which defendant was free to disengage. In support, defendant cites a single case—*People v. Ocampo*, 377 Ill. App. 3d 150, 156 (2007)— and only for the general proposition that a consensual police encounter is one where a "person would feel free to disregard the police and go about his or her business."  This does little to advance his argument.

¶ 43    In any event, defendant's argument fails because it relies on his claim that no traffic stop took place.  We rejected that claim above.  Further, viewing the evidence in the light most favorable to the State, a rational trier of fact could have reasonably inferred that defendant knew that he was subject to a traffic stop.  Taylor approached McDaniel's residence in a police vehicle with its overhead lights activated, pulled his squad car directly in front of the vehicle that defendant had been driving, and—despite the presence of two other individuals who exited the vehicle—called out only to the individual who had been driving.  See *People v. Laake*, 348 Ill. App. 3d 346, 350 (2004) ("[A] police officer's use of overhead emergency lights, when directed at a particular person, would be interpreted by that person as a command to stay put.").  Thus, the jury could have concluded that defendant, by refusing to talk to Taylor, knowingly obstructed a traffic stop.

¶ 44                                    C. Materiality

¶ 45    Last, defendant argues that, even if the State proved beyond a reasonable doubt that Taylor was performing an authorized act and that defendant knew that Taylor was doing so, the State failed to prove that defendant's actions materially impeded Taylor's performance of that act.  In response, the State maintains that this argument is "improper[ ]" because defendant agreed to the jury instructions for obstruction, which did not include a materiality requirement.  Thus, according to the State, defendant has forfeited any challenge to the instructions, and it would be "profoundly unfair" to require the State to prove anything beyond those propositions on appeal.  However, defendant's response to the State's argument makes clear that he is not challenging the jury instructions, but only arguing the State's failure to prove an element of the offense beyond a reasonable doubt, which the State was required to do.

¶ 46    The State does not dispute that, under section 31-1(a) of the Criminal Code (720 ILCS 5/31-1(a) (West 2022)), the State must prove that the alleged obstructive conduct materially hindered or impeded the officer's performance of an authorized act.  See *People v. Gotschall*, 2022 IL App (4th) 210256, ¶ 26 ("[T]he offense of obstructing a peace officer set forth in section 31-1(a) of the [Criminal] Code includes a material impediment requirement."); *Mehta*, 2020 IL App (3d) 180020, ¶ 26  ("[O]bstruction of a peace officer is committed only where a defendant's conduct creates an obstacle that materially impedes or hinders the officer in the performance of his authorized duties."  (Internal quotation marks omitted.)).  In two unpublished decisions, this court has twice agreed with *Gotschall* and *Mehta*, holding that the alleged obstructive conduct must be material.  See *People v. Osman*, 2024 IL App (2d) 230149-U, ¶ 36; *People v. Jackson*, 2023 IL App (2d) 230131-U ¶¶ 45-46.  We reaffirm those decisions.

¶ 47    Even more recently, in *Coates*, 2025 IL App (4th) 231312, ¶¶ 47-51, the Fourth District considered whether the failure to instruct the jury that the State was required to prove that the

defendant " 'materially' " impeded an officer, was instructional error. The instructions in *Coates* were virtually identical to those issued here. *Id.* ¶ 51. The court found no error, stating:

> "Although we agree with [the] defendant that the State was required to show [that] [the] defendant's conduct constituted a 'material' impediment to the performance of [the] officer's] duties, we disagree that materiality is a *unique* element of the offense requiring a separate instruction. Instead, we agree with the State [that] the requirement of materiality is merely definitional; it is based on Illinois courts' statutory interpretation of the meaning of the word 'obstruct.' " (Emphasis in original.) *Id.*

Thus, based on *Coates*, even if defendant challenged the jury instructions here (which he does not), his challenge would fail. In any event, as noted, the State does not dispute that defendant's act of obstruction must be material.

¶ 48    We now consider whether the State proved beyond a reasonable doubt that defendant's alleged obstructive act—walking away from a traffic stop—materially impeded Taylor's ability to conduct that traffic stop. There are several factors to consider when determining whether a defendant's alleged obstructive act constituted a material hindrance of an officer's authorized acts. The factors include: "(1) the length of the delay caused by the act, which is a 'primary factor'; (2) whether the officers initiating the traffic stop were familiar with the defendant; and (3) whether the act tends to pose a risk to officer safety." *Id.* ¶ 30 (quoting *Mehta*, 2020 IL App (3d) 180020, ¶¶ 32-34). This is a "fact-intensive" inquiry, and " 'obstructive acts that may not create a material impediment in one set of circumstances may nevertheless create such an impediment in other circumstances.' " *Id.* (quoting and citing *Mehta*, 2020 IL App (3d) 180020, ¶ 33).

¶ 49    Here, defendant argues that his action of "moving inside the house to avoid talking to [Taylor] did not materially impede Taylor." He argues that there were "no officer safety concerns

stemming from [his] conduct" and that "the length of the delay *** was *de minimis*." According to defendant, "[e]ven without speaking to [defendant], Taylor obtained [defendant's] name and other information from what he observed in his squad-cam footage."

¶ 50    In support of his argument, defendant relies on *People v. Taylor*, 2012 IL App (2d) 110222. In *Taylor*, the defendant, who was wanted on a warrant, was crossing the street when an officer driving by recognized him from previous encounters. *Id.* ¶ 3. After confirming that the defendant's warrant was still active, the officer approached the defendant and asked him for identification because, although the officer was " 'pretty sure' " of the defendant's identity, he was not positive. *Id.* ¶¶ 3-4. The defendant identified himself as "Keenan T. Smith." *Id.* ¶ 4. The officer ran this name through his computer system, which did not show that any such person existed. *Id.* The officer returned to the defendant, who eventually divulged his real name. *Id.* The officer arrested the defendant and then confirmed the defendant's identity by looking at the identification card he was carrying. *Id.* The officer testified that the entire encounter, from approaching the defendant to handcuffing him, took " 'under ten minutes.' " *Id.*

¶ 51    On appeal, the defendant argued that his actions could not amount to obstruction of justice under section 31-4(a) of the Criminal Code of 1961 (720 ILCS 5/31-4(a) (West 2008)), because his giving a false name did not materially impede the officer's investigation. *Id.* ¶¶ 8-9. We agreed, concluding that "[the defendant's] initial giving of a false name to [the officer] and his denial that he had identification did not materially impede [the officer's] arrest of [the defendant]." *Id.* ¶ 17. We reasoned that (1) "the entire encounter took no more than a few minutes," (2) the officer was " 'pretty sure' " he knew the defendant's true identity, (3) the officer arrested the defendant before he ever saw the defendant's identification card, and (4) the arrest occurred immediately after the defendant "voluntarily decided to cooperate." *Id.*

¶ 52    *Taylor* does not support defendant's argument. In fact, it supports the opposite conclusion. Here, unlike in *Taylor*, Taylor did not know defendant's name and defendant never voluntarily decided to cooperate. Instead, defendant walked away and never cooperated. Because of defendant's act of walking away from Taylor, Taylor was unable to complete the traffic stop at that time. Taylor left McDaniel's residence and returned with additional officers. Taylor again attempted to speak with defendant. Defendant refused to do so. Thereafter, to identify defendant, Taylor was forced to obtain a still photograph from his body camera and email it to the police department for identification—approximately 20 hours passed before Taylor was able to identify defendant. Then, after doing so, Taylor had to obtain a warrant for his arrest.

¶ 53    Given the extended delay caused by defendant's act of walking away from the traffic stop, a rational jury could have found that defendant's act materially hindered the traffic stop. Indeed, "a traffic stop *** is intended to be a relatively brief encounter." *Coates*, 2025 IL App (4th) 231312, ¶ 42. Because of defendant's actions, that was not the case here.

¶ 54                              III. CONCLUSION

¶ 55    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 56    Affirmed.